[No. 49167-4. En Banc. July 28, 1983.]

COAST TO COAST STORES, INC., *Appellant,* v. HARRISON
J. GRUSCHUS, ET AL, *Respondents.*

DORE and ROSELLINI, JJ., dissent by separate opinion.

*Davis, Arneil, Dorsey, Kight & Parlette, Jay A. Johnson,
Bogle & Gates,* and *Ronald T. Schaps,* for appellant.

*Huppin, Ewing, Anderson & Hergert, P.S.,* by *Irving
Paul* and *Larry L. Mundahl,* for respondents.

PEARSON, J.—Plaintiff Coast to Coast Stores (Central
Organization), Inc.,[1] a franchisor, appeals a trial court deci-
sion requiring plaintiff to purchase the inventory of
defendant franchisee's business.

---

[1]Hereinafter referred to as Coast.

The principal issue presented by this appeal is whether a franchise is terminated when the franchisee's business is suspended by the franchisor's exercising its right under a security agreement to repossess the franchisee's inventory. We hold that repossession of inventory by the franchisor does not, on the facts in this case, constitute termination of the franchise. The trial court therefore erred by requiring the franchisor to pay a fair market value for the inventory under RCW 19.100.180, and we accordingly reverse.

Defendants, Mr. and Mrs. Gruschus, purchased a hardware business in Wenatchee from Mr. and Mrs. Hegstad. The business was operated under a franchise agreement with plaintiff Coast. After purchasing the business and its assets from the Hegstads, defendants entered a franchise agreement with Coast in January 1979, under which they acquired the right to continue to use Coast marks in the business. Defendants obtained from the Hegstads a long-term lease on the building in which the store was located, and an option to purchase.

In February 1979, Coast filed financing statements covering the fixtures, equipment, inventory, and accounts receivable of the hardware store. In May 1979, defendants executed a security agreement granting Coast a security interest in the collateral.

Defendants borrowed money from Rainier Bank to purchase the business. Inventory was obtained from Coast on credit, and from July 1979 defendants were delinquent in their account with Coast. Eventually the defendants owed Coast more than $100,000. Mr. Gruschus discussed the store's financial difficulties with a representative of Coast at a convention in January 1981. At that time, additional capital was necessary to continue the business, but high interest rates and the store's unprofitability prevented defendants' obtaining a loan.

In February 1981, Coast's store finance manager wrote to defendants informing them that shipments of inventory would be withheld until defendants' indebtedness to Coast was reduced to $96,000. On March 12, the finance manager

wrote again, this time requesting that the debt be reduced below $100,000 by April 15, 1981. Defendants' attorney contacted Coast on April 10, and advised that defendants could not continue with the business. She informed Coast that unless Coast purchased the store from them, defendants would be forced to discontinue or abandon the business.

On April 17, 1981, Coast informed defendants' attorney that defendants were in default under their security agreement and demanded possession of the collateral. The parties agreed that the best course to protect the collateral was to double–lock the store and provide each party with a key. The store was accordingly double locked on April 17. On April 24, 1981, Coast moved for a temporary restraining order to freeze any dealing with the inventory, equipment, and accounts receivable in the store. A temporary restraining order was entered on May 14. Defendants responded on May 29 with a motion to require Coast to pay fair market value for all inventory, supplies, furnishings and goodwill in the store pursuant to the Franchise Investment Protection Act, RCW 19.100.

A hearing was held on June 19, 1981. Defendants produced testimony from an expert witness who valued the inventory of the store at $232,913.75. Coast produced an expert who valued the inventory at $165,353.10. The court entered a memorandum decision on July 2, 1981. On August 7, 1981, findings of fact, conclusions of law, and an order were entered.

The trial court ordered Coast to purchase all inventory and supplies from the store for $233,413.75. This order was based on a finding that the franchise agreement was terminated on April 17, 1981, and a conclusion that RCW 19.100.180(2)(j) accordingly imposed a duty on Coast to purchase the inventory from defendants at a fair market value. The trial court denied defendants' claim for attorney fees under RCW 19.86.090. Coast appealed the trial court's order and defendants cross–appealed on the issue of attorney fees. The appeals were certified to this court.

This case presents first instance issues of interpretation of this state's Franchise Investment Protection Act (FIPA). RCW 19.100. This act, which provides comprehensive regulation of franchising, is in two parts. The first regulates the offering and sale of franchises, and includes detailed requirements for registration and disclosure similar to provisions regulating the sale of securities. RCW 21.20. The second part of FIPA is designed to resolve problems which arise out of the relationship between a franchisor and a franchisee.

> The franchisor normally occupies an overwhelmingly stronger bargaining position and drafts the franchise agreement so as to maximize his power to control the franchisee. Franchisors have used this power to terminate franchises arbitrarily, to coerce franchisees under threat of termination, and to force franchisees to purchase supplies from the franchisor or approved suppliers at unreasonable prices, to carry excessive inventories, to operate long, unprofitable hours, and to employ other unprofitable practices.

(Footnotes omitted.) Chisum, *State Regulation of Franchising: The Washington Experience,* 48 Wash. L. Rev. 291, 297–98 (1973). FIPA responds to these problems with a "fair practices" or "franchisee bill of rights" section. RCW 19.100.180. It is this section which is before the court in this case.

RCW 19.100.180 is in two parts. The first, RCW 19.100-.180(1), provides the laconic directive: "The parties shall deal with each other in good faith".

The second part is more specific. It provides a lengthy list of proscribed conduct. RCW 19.100.180(2) provides that "it shall be an unfair or deceptive act or practice or an unfair method of competition and therefore unlawful and a violation of this chapter for any person to . . ." perform any of 10 specified acts. The last in this list of proscribed acts is: "Terminate a franchise prior to the expiration of its term except for good cause". RCW 19.100.180(2)(j). This is the provision which the court is now asked to construe.

There is no allegation in this case that the franchise was

terminated without good cause. Rather, the dispute centers around the concluding portion of RCW 19.100.180(2)(j) which provides for the franchisor's obligation upon termination of the franchise.

> Upon termination for good cause, the franchisor shall purchase from the franchisee at a fair market v..lue at the time of termination, the franchisee's inventory and supplies, exclusive of (i) personalized materials which have no value to the franchisor; (ii) inventory and supplies not reasonably required in the conduct of the franchise business; and (iii), if the franchisee is to retain control of the premises of the franchise business, any inventory and supplies not purchased from the franchisor or on his express requirement: *Provided,* That a franchisor may offset against amounts owed to a franchisee under this subsection any amounts owed by such franchisee to the franchisor.

Defendant argues that the franchise was terminated on April 17, 1981, when the store was locked and business ceased, and that therefore Coast has a duty under the above quoted provision to purchase the inventory at a fair market value. This argument was accepted by the trial court. As a result, Coast was not entitled to exercise its right to repossess the inventory and sell it in a commercially reasonable sale, pursuant to its security agreement and the Uniform Commercial Code, RCW 62A.9–504(3).

The crux of the trial court's decision is the conclusion that the franchise was terminated on April 17, 1981. This conclusion is explained in the trial court's findings of fact 22, 23, and 24.

> 22. That at the time the store was locked on April 17, 1981, the Central Organization stood willing and able to continue to operate under the Franchise Agreement provided the Gruschuses would meet their financial commitments, or other satisfactory arrangements were made.
>
> 23. That at the time the store was locked on April 17, 1981, the Gruschuses were willing to continue operation of the Coast to Coast Store under the Franchise Agreement if they were able to obtain goods and services, but they were unable to do so.
>
> 24. That the Franchise Agreement between the Grus-

chuses and Central Organization was terminated in fact on April 17, 1981 because the Gruschuses could not meet their financial commitments to Central Organization and because Central Organization would not continue to operate under the Franchise Agreement if the Gruschuses did not meet their financial commitments, or make satisfactory arrangements.

In other words, the franchise was terminated by the mutually agreed upon double locking of the store at a time when the franchisee was unable to continue to conduct the franchise business. No notice of termination was given as required by RCW 19.100.180(2)(j) and by provision 11 of the franchise agreement.

█ It appears that the trial court equated cessation of the franchise business with termination of the franchise under RCW 19.100.180(2)(j). This was error. Under FIPA, the franchise is conceptually distinct from the franchisee's business. The term "franchise" is defined in FIPA as an agreement between the franchisor and the franchisee, whereby the franchisee is granted a license to use a trade name, service mark, or the like. This is clear from RCW 19.100.010(4), which provides:

"Franchise" means an oral or written contract or agreement, either expressed or implied, in which a person grants to another person, a license to use a trade name, service mark, trade mark, logotype or related characteristic in which there is a community interest in the business of offering, selling, distributing goods or services at wholesale or retail, leasing, or otherwise and in which the franchisee is required to pay, directly or indirectly, a franchise fee . . .

The franchise, therefore, is the agreement between the parties, and not the business operated by the franchisee. The franchise might exist quite independently of the franchisee's business, as for example where the franchise agreement is concluded before any business operations commence. It follows, therefore, that cessation of the franchisee's business operations does not necessarily constitute termination of the franchise.

The language of RCW 19.100.180(2)(j) itself provides a clear indication that cessation of the franchisee's business does not constitute termination of the franchise. The second proviso of that section provides that in certain circumstances the franchisor may terminate a franchise without giving notice or an opportunity to cure the default. These circumstances are present where the franchisee:

(i) Is adjudicated a bankrupt or insolvent; (ii) makes an assignment for the benefit of creditors or similar disposition of the assets of the franchise business; (iii) voluntarily abandons the franchise business; or (iv) is convicted of or pleads guilty or no contest to a charge of violating any law relating to the franchise business.

This language suggests that not even the bankruptcy or insolvency of the franchisee, or the abandonment of the business by the franchisee will terminate the franchise. Even in those events, termination must be accomplished by the franchisor, who is under those circumstances relieved of the duty to give notice.

We conclude therefore from the plain words of FIPA that a franchise is terminated only when the agreement between the franchisee and franchisor is brought to an end, terminating the franchisee's right to use the franchisor's trade name, service mark, or the like.

No hardship is imposed upon the franchisee by this interpretation. The franchisor with the security interest in inventory would be entitled to repossess and dispose of the collateral by a commercially reasonable sale. RCW 62A.9–504. If that sale realizes more than the amount of the indebtedness, the franchisor must account to the franchisee for the surplus. If the sale realizes less than the amount of the indebtedness, the franchisee is liable for the deficiency. RCW 62A.9–504(2). This is exactly what would occur if the secured party with a security interest in the inventory were any entity other than the franchisor. There appears to be no reason to require a different result merely because the secured party is the franchisor.

On the contrary, the U.C.C. achieves the same result as

that sought by RCW 19.100.180(2)(j). The franchisor is required by subsection (2)(j) to purchase the inventory following termination to protect the franchisee from being left without a franchise, but with a substantial investment in inventory which he cannot sell. If the franchisor exercises his right to repossess that inventory, the same objective is achieved.

In fact, the only significant practical difference between the two procedures in the present case is the method by which the inventory is valued. Under the U.C.C. repossession procedure, the value is the price paid by a buyer at a commercially reasonable sale. Under the enforced repurchase procedure of subsection (2)(j), the value is the estimated "fair market value". The price obtained for the inventory at an actual sale, conducted in accordance with all the safeguards of the "commercially reasonable" requirement of RCW 62A.9–504, is a better basis for valuation than the hypothetical "fair market price". As the present case illustrates, expert opinions of fair market price may vary widely. The actual price obtained at a commercially reasonable sale is a considerably more reliable indication of the true value of the inventory.

Moreover, this interpretation gives effect to the provisions of the U.C.C. without violating the intent or purposes of FIPA. The trial court's approach, on the other hand, ignores the U.C.C. and renders the franchisor's security interest redundant in the very circumstances (financial failure of the debtor) in which it was intended by the parties to operate.

The provisions of RCW 19.100.180(2)(j) will not operate in the present case unless the franchise agreement between the parties has been terminated. No evidence of such termination appears in the record; on the contrary, the trial court specifically found the parties willing to continue their performance of the agreement had defendants been able to obtain financing. Accordingly, the franchise was not terminated and Coast is entitled to exercise its rights as a secured party in respect of the inventory.

Our resolution of this issue makes it unnecessary to consider the other matters raised by the parties.

The trial court is reversed.

WILLIAMS, C.J., and STAFFORD, UTTER, BRACHTENBACH, DOLLIVER, and DIMMICK, JJ., concur.

DORE, J. (dissenting)—The issue involved here is whether the franchisor, by foreclosing on a business inventory pursuant to the Uniform Commercial Code, can avoid the protective provisions for the franchisee in the 1971 Franchise Investment Protection Act (Franchise Act), as amended, and not pay the franchisee the reasonable market value of his inventory.

The majority holds that the Uniform Commercial Code, harmonized with the Franchise Act, allows the franchisor to completely avoid the inventory provisions of the Franchise Act without giving notice of forfeiture to the franchisee. The franchisor accomplishes this simply by obtaining a security instrument on the franchisee's inventory, then foreclosing on the security instruments without giving notice of forfeiture or allowing the franchisee the opportunity to cure its deficiency. This result was unintended by the Legislature and virtually repeals the Franchise Act with regard to inventory protection.

I

This case was originally commenced by Coast to Coast Stores (Central Organization), Inc. (hereinafter designated Coast) for repossession and judicial foreclosure of a security interest. The Gruschus owned and operated a Coast hardware store in Wenatchee, Washington, under a franchise agreement which was entered into between the parties on January 12, 1979. From that time until April 17, 1981, the store was operated with the Gruschus purchasing most of their inventory from or through Coast. Coast extended credit to the Gruschus throughout this period. There was a security agreement on inventory, equipment and accounts of the Gruschus' store in favor of Coast.

By 1981, it was clear that the Gruschus' store was in financial difficulty, as they now owed over $100,000. Accordingly, at the 1981 Coast convention held in Portland, Gruschus discussed the situation with Coast's management. Among the alternatives discussed was the possibility of the Gruschus obtaining a bank loan. At the Portland meeting, Gruschus was told that except for promotional ordering, Coast would stop shipping to him if he were not able to get his debts below $96,000. This was later modified so that Gruschus could receive shipments for basic store inventory providing that he would pay for such merchandise on a COD basis, plus paying an *extra* 10 percent surcharge on each order.

Gruschus then had a discussion with the district manager, Rice, which was confirmed with a letter from the finance manager, Edwards. The letter was dated March 12, 1981 and stated, among other things, that all future shipments would be on a COD basis plus 10 percent. Edwards went on to observe:

> If there is any deviation from the cash with order policy plus 10%, *orders will be withheld.* Any direct shipments will be subject to the same processing as indicated.
> . . .
> Please note that the cash with order program *will only go on until April 15, 1981.* At that time the account must be below the originally agreed upon $100,000. This program is just to allow you to have some merchandise in the store to continue business.

(Italics mine.) Exhibit 3.

The "COD plus 10 percent" policy meant that the Gruschus could not purchase inventory from Coast even on a COD basis. Rather, they had to pay an *additional* amount as payment against their debt. Then, after April 15, 1981, Coast would no longer ship them any merchandise unless their debt was below $100,000. The Gruschus simply did not have the wherewithal to reduce the debt to this extent. When questioned by the judge, Edwards admitted the letter (exhibit 3) meant that *no more merchandise would be shipped, even COD, after April 15 unless the debt was*

*below $100,000.*[2]

On April 15, 1981, Rice went to Wenatchee specifically for the purpose of contacting the Gruschus about liquidating the store. At no time, however, did he make any offer to have Coast purchase back inventory or fixtures at the fair market value. Rice contacted Coast's Wenatchee attorney, Ray Foianini, who got in touch with the Gruschus' attorney, Ray Cordell. Cordell testified:

A  The plaintiffs were demanding possession of the assets under the U.C.C. and I said that we did not believe that all of the issues had been resolved and we were unwilling to grant possession back to the plaintiffs. This was on April 17th. We agreed that it would be economical in terms of attorney fees and also because of the possibility of a restraining order, which the defendants eventually did obtain, to have a lockdown of the local store.

. . .

Q  Were you actually told by Mr. Foianini that Coast was actually going to obtain a temporary restraining order if he did not agree to the lockdown?
A  He said—I think his words were, We can obtain a restraining order if you don't agree.

Report of Proceedings, at 59–60.

Faced with Coast's threat to get a temporary restraining order, together with the previous letter advising that Coast would not ship merchandise after April 15, 1981, the Gruschus' attorney agreed to a 2–lock procedure of the store, whereby neither Coast nor the Gruschus could enter the store without the other party.

Based on the testimony presented, the trial court found that Coast advised the Gruschus that a temporary restraining order would be entered unless the store was locked; that the franchise agreement was, in fact, terminated on April 17, 1981; and that the franchise agreement was terminated because the Gruschuses could not meet their financial

---

[2]Coast's termination thus predates exercise of its rights under the security agreement, as Coast stopped shipping goods even before any suit for foreclosure of the security interest was commenced.

commitments to Central Organization and because Central Organization would not continue to operate under the Franchise Agreement if the Gruschuses did not meet their financial commitments, or make satisfactory arrangements.

Clerk's Papers, at 21.

## II

In *1980,* The Franchise Act was amended in relation to the termination of a franchise. The amendment (RCW 19.100.180(2)(j)) reads:

[A]fter three wilful and material breaches of the same term of the franchise agreement occurring within a twelve–month period, for which the franchisee has been given notice and an opportunity to cure as provided in this subsection, the franchisor may terminate the agreement upon any subsequent wilful and material breach of the same term within the twelve–month period without providing notice or opportunity to cure . . .

The legislative intent of the inventory protection amendment is best illustrated by the statements of Senators Rasmussen and Van Hollebeke on the floor of the Senate.

Senator Rasmussen: "Mr. President, the reason I raised that question, my concern is that some years ago, of course, we passed a law to protect the franchise holder and automobile dealers and other franchise holders, so that they could not come in and cancel you out willy–nilly without giving due concern to the fact that you had a big investment in your business. And I am just wondering if this is not opening the door to that. I have a few reservations about it yet, Senator Van Hollebeke, even though you did explain it."

Senator Van Hollebeke: "Senator, please accept my assurance it does not do that. What it would do, is if a person breached a contract four times within a calendar year, they could cure the first three times and the fourth time they breached, the franchisor would be allowed to begin an action to terminate the contract, to terminate the franchise agreement; it has already been breached; that is all it would do. And I have been on both sides of all of these kinds of things and I can guarantee you that is not something I would want to have some businessman

out there with a little convenience grocery store operator or an automobile agency that has two or three million dollars invested; that is the last thing I would want and the last thing the state needs."

Senate Journal, 46th Legislature (1980), at 500.

It is clear from the above quoted discussion between the senators that they intended the franchisees would have up to four *willful* and material breaches during the same term of the franchise agreement occurring within a 12–month period, for which the franchisee would be given *notice and an opportunity to cure* before termination.

A discussion between Senators Guess and Morrison at pages 500–01 of the Senate Journal, 46th Legislature (1980) sheds light on the definition of "willfulness":

> Senator Guess: "Senator Rasmussen, I think I share the same problems that you have, for instance the mom and pop store that was closed down in a particular neighborhood finally ended up with a 7–11 franchise. Now if things get a little bit slow in that area and he is not able to hold that inventory up to the level that the contract required, even though he would like very much to, is he going to be canceled out of his franchise on that 7–11? And I am sorry to be using a trade name but I, Circle K, or anything else like that. This is the question that comes to my mind."
>
> . . .
>
> Senator Morrison: "Mr. President and ladies and gentlemen of the Senate. I would like to partially answer Senator Guess' question. This requires a willful and intentional breach of the contract four times in any given year. In the case of the 7–11 store since you brought up that particular group, Senator Guess, they start the store with the company furnishing, say, a certain amount of inventory and there is an obligation that they maintain that inventory at approximately the same level. If they run the inventory down and pocket the money themselves, that is, if proven in the courts, a willful violation or breach of the contract."

Under RCW 19.100.180(2)(j), the franchisor *still* has the *duty* and obligation *to purchase inventory* and supplies at *fair market value,* even if he is terminating for good cause.

The statute provides, in fact, that even bankruptcy or the abandonment of the business by the franchisee does not automatically terminate the franchise, but only gives the franchisor good cause for termination. Following good cause termination, the franchisor *still* has the obligation to purchase inventory at fair market value.

The findings of fact entered by the court indicate that there was neither mutual termination nor anticipatory repudiation.

The majority mischaracterized the closing of the Gruschus' store as a "mutual termination". Such is simply not the case. Coast makes much of the fact that Judge Cone used the word "mutual" in his memorandum opinion. The important factor, however, is that when the judge became aware of the ramifications of this word, he refused to use it in the findings of fact or conclusions of law. If there is a conflict between the memorandum opinion and the findings of fact or conclusions of law, the latter governs.

> Appellants, in their arguments in support of their appeal, refer to the oral opinion and the memorandum opinion of the trial court. These may be considered in interpreting the findings of fact and conclusions of law, but they *cannot be considered* as the basis for the trial court's judgment and sentence. A trial court's oral or memorandum opinion is no more than an expression of its informal opinion at the time it is rendered. It has no final or binding effect unless formally incorporated into the findings, conclusions, and judgment.

(Italics mine.) *State v. Mallory,* 69 Wn.2d 532, 533–34, 419 P.2d 324 (1966).

In the case at bar, a hearing was held before Judge Cone on August 7, 1981 for purposes of entering findings and conclusions. Coast's attorney specifically argued that the court should use the term "mutual" in connection with its findings of fact based upon the memorandum decision. The court observed:

> We use the word "mutual termination," it wasn't mutual, it just happened. They got in a situation where in fact there was no way to go on by either party. I don't know

how you word that. It was partially caused to occur by the actions of the organization and partly because Mr. Gruschus was unwilling or unable to meet their terms.

. . .

They got into a situation where Coast to Coast rightfully would not extend further credit and Mr. Gruschus could not, under the circumstances then existing, continue with the operation, and would not.

. . .

I think that should read that the termination happened for the reason that Coast to Coast was unwilling to extend further credit.

Supplementary Report of Proceedings, at 23–24.

Then at page 31, the court again observed:

Yes, "mutually" should probably be left out. I don't have the law in front of me, but if the word is used it shouldn't be used in here because it doesn't apply.

Accordingly, in finding of fact 17 the judge observed that Coast would obtain a temporary restraining order unless the Gruschus agreed to lock the store. Finding of fact 19 states that the franchise agreement was terminated in fact (with no mention of mutuality) on April 17, 1981. In finding of fact 24, the judge observed that the termination was because the Gruschus could not meet financial conditions imposed by Coast, and Coast "would not continue to operate under the Franchise Agreement if the Gruschuses did not meet their financial commitments, or make satisfactory arrangements". Clerk's Papers, at 21. It is clear, therefore, that appellant's argument that this was a mutual termination has no support in the findings and conclusions. The trial court's ruling that there was a termination, that it was caused by Coast, and that RCW 19.100.180(2)(j) applies is fully supported by substantial evidence in the record.

Additionally, paragraph 7 of the agreement reads:

(C) In the event that bankruptcy proceedings, voluntary or involuntary, or any other proceedings for the benefit of creditors, voluntary or involuntary, are instituted by or against STORE OWNER, . . . this franchise agreement . . . *shall automatically* and simultaneously *terminate.*

(Italics mine.) Exhibit 1.

The institution of this very action together with entry of the temporary restraining order constitutes termination of the agreement. By refusing to ship merchandise, by forcing the store to be locked, and by bringing this lawsuit, Coast has clearly prevented the Gruschus from operating a Coast hardware store. Taking away the means to go on with the contract constitutes a termination. *Cromer v. Henry,* 203 Ark. 497, 157 S.W.2d 507, 508 (1942).

The franchise agreement terminated in fact after Coast threatened a temporary restraining order, stopped shipment of goods, and "because Central Organization would not continue to operate under the Franchise Agreement if the Gruschuses did not meet their financial commitments, or make satisfactory arrangements". Clerk's Papers, at 21. These findings of fact are supported by overwhelming evidence and may not be disturbed on appeal. *Golberg v. Sanglier,* 96 Wn.2d 874, 639 P.2d 1347, 647 P.2d 489 (1982).

### III

There is no conflict between the provisions of article 9 of the Uniform Commercial Code and the Franchise Act. The Gruschus are not challenging Coast's right to a security interest and lien on the inventory, fixtures, supplies, and receivables of their store. Coast may terminate the relationship and take possession of the collateral. Absent the Franchise Act, a creditor in this position would hold a public or private sale pursuant to the Uniform Commercial Code in order to liquidate the inventory. The Gruschus would be entitled to any surplus from the sale or would be liable for any remaining obligation. The Franchise Act merely specifies a buyer for the merchandise and a means of evaluating price. Coast still acquires possession of the inventory, but must credit to the Gruschus the fair market value of the inventory rather than liquidation value. Additionally, there is no restriction on Coast's other security interests, including its interest in fixtures, receivables, etc.

Of course, concurrent statutes covering the same subject matter will be harmonized to the extent possible. *State v. Bower,* 28 Wn. App. 704, 626 P.2d 39 (1981).

To the extent that there is any conflict between the statutes, the Franchise Act must prevail. RCW 19.100.180(2)(g) prohibits a franchisor from having a franchisee waive any of the protections offered by the Franchise Act. Any attempt by Coast to assert that it does not have to comply with the Franchise Act because of the franchisee's signature on a security agreement would constitute exactly such a waiver. Again, it must be remembered that the requirement to purchase inventory at fair market value extends to a franchisor/creditor even in cases of termination for cause, and even in cases of bankruptcy. Additionally, any violation of RCW 19.100.180 is automatically an unfair business practice and falls under the Consumer Protection Act, RCW 19.86, which is to be liberally construed. *Keyes v. Bollinger,* 31 Wn. App. 286, 294, 640 P.2d 1077 (1982).

## IV

RCW 19.100.180(2)(j) requires that Coast pay "fair market value" for the franchisee's inventory and supplies. In this case, there is no dispute about the $500 for the supplies. Following extensive testimony by both parties on the issue of inventory value, the judge found that the fair market value of all of the inventory was $232,913.75, the identical figure testified to by the defendants' expert. Again, this is a finding of fact which is supported by substantial evidence.

We have consistently defined the term "fair market value" as the amount of money which a purchaser willing, but not obligated, to buy property would pay an owner willing, *but not obligated, to sell* it, taking into consideration all uses to which the property is adapted and might in reason be applied. *See In re Eggert,* 82 Wn.2d 332, 335, 510 P.2d 645 (1973); *In re Schmitz,* 44 Wn.2d 429, 434, 268 P.2d 436 (1954); *Donaldson v. Greenwood,* 40 Wn.2d 238, 252, 242 P.2d 1038 (1952). This is the way the business

consultant expert who testified defined fair market value, and was the measure of value he arrived at. By contrast, Coast argues that a liquidation or distress sale value is more appropriate. This approach makes no sense in terms of the purpose of the Franchise Act, nor is it consistent with Washington law.

> "Fair market value" means neither a panic price, auction value, speculative value, nor a value fixed by depressed or inflated prices. We have defined it as the amount of money which a purchaser willing, but not obliged, to buy the property would pay an owner willing, but not obligated, to sell it, taking into consideration all uses to which the property is adapted and might in reason be applied. *Ozette R. Co. v. Grays Harbor County*, 16 Wn. (2d) 459, 133 P. (2d) 983.

*Donaldson*, at 252. It is clear, then, that the court used the correct measure of valuation. The court's finding that the Gruschus' inventory was more reliable than the Coast inventory is supported by substantial evidence.

V

The trial judge's findings of fact support Gruschus' argument on cross appeal that, as a matter of law, Coast breached the Franchise Act.

RCW 19.100.180(2) does *not* require any type of bad faith or bad motives. Rather, failure to comply with the provisions of the statute are, per se, unfair and deceptive acts and unfair methods of business. RCW 19.100.180(1) is a *separate* portion of the statute imposing upon a franchisor the obligation to act in good faith. RCW 19.100-.180(2), however, sets out specific practices which are illegal on their own. Violations then become violations of the Consumer Protection Act, RCW 19.86.

A Consumer Protection Act claim may be based on a per se violation of a statute *or* on unfair or deceptive practices unregulated by statute but involving public interest. *Anhold v. Daniels*, 94 Wn.2d 40, 614 P.2d 184 (1980); *Lidstrand v. Silvercrest Indus.*, 28 Wn. App. 359, 623 P.2d 710 (1981). Plaintiffs claiming a per se violation of the Con-

sumer Protection Act must show:

1. The existence of a pertinent statute;
2. Its violation;
3. That such violation was the proximate cause of damages sustained; and
4. They were within the class of people the statute sought to protect.

*Dempsey v. Joe Pignataro Chevrolet, Inc.,* 22 Wn. App. 384, 393, 589 P.2d 1265 (1979); *Keyes v. Bollinger,* 31 Wn. App. 286, 289–90, 640 P.2d 1077 (1982). *See also Salois v. Mutual of Omaha Ins. Co.,* 90 Wn.2d 355, 581 P.2d 1349 (1978).

In the subject case, all of the requirements for a per se violation exist. First, there is a pertinent statute, RCW 19.100.180(2)(j). Second, there has been a violation. Coast has refused to purchase the inventory from the Gruschus at fair market value. Third, this violation was a proximate cause of damage. Coast refuses to pay and/or credit $233,413.75 to the franchisee. This money is unavailable to the Gruschus to satisfy other debts or to use in any manner. Additionally, the Gruschus have been forced to commence this action and incur significant legal fees. They also continue to be charged interest by the other creditors with priority security interests on the inventory. Finally, the Gruschus, as franchisees, are within the class of people the Franchise Act seeks to protect.

## CONCLUSION

The evidence is overwhelming that Coast failed to notify the Gruschus of termination under the Franchise Act and give them an opportunity to *cure* the breach before terminating the operation. Had Coast given such notice to Gruschus, he would have had an opportunity to secure a bank loan. A modest loan would have been adequate to cure the deficiency during April 1981, when Coast was foreclosing on its security agreement. It is rather difficult, if not impossible, to secure a loan when your business is being foreclosed. The Franchise Act guaranteed Gruschus notice of termina-

tion and an *opportunity to cure* his deficiency.

The trial court judgment should be affirmed. On Gruschus' cross appeal, I would find that the trial court erred in failing to find a violation of the "franchisee's bill of rights" and would remand this issue to the lower court for the purpose of determining court costs and reasonable attorney fees at both the trial and appellate levels.

ROSELLINI, J., concurs with DORE, J.

Reconsideration denied September 20, 1983.