520

[No. 26220-3-I.   Division One.   October 5, 1992.]

CRAIG D. CORP, ET AL, *Plaintiffs,* BOB VERNON, ET AL,
*Appellants,* v. ATLANTIC-RICHFIELD
COMPANY, *Respondent.*

*Carl A. Taylor Lopez* and *Lopez & Fantel, Inc., P.S.,* for appellants.

*Douglas C. Berry* and *Graham & Dunn,* for respondent.

PEKELIS, J. — This case involves an action brought by 12 convenience store operators against Atlantic-Richfield Company (ARCO) for alleged violations of Washington's Franchise Investment Protection Act (FIPA), RCW 19.100. Appellants challenge a series of pretrial rulings which resulted in the entry of a final judgment in favor of ARCO. They contend that the trial court erred in (1) determining as a matter of law that ARCO had neither terminated nor failed to renew their franchise agreements under RCW 19.100.180-(2)(i) and (j); (2) dismissing their claims for misrepresentation under RCW 19.100.170(2); (3) denying their motion to amend a stipulation and pretrial order to include additional

claims against ARCO; and (4) dismissing appellants John and Helen Stertz from the case. We affirm in part and reverse in part.

I

In the early 1970's, ARCO introduced the "minimarket" program, which combined a convenience store with gasoline sales. Between 1976 and 1979, all appellants joined the program by executing a standard 3-year service station lease licensing the sale of ARCO gasoline. Appellants also executed a lease addendum which authorized the sale of "convenience food store products" and specified payment of a royalty based on total grocery sales. The standard fee was 8 percent in the case of some dealers and 10 percent in the case of others. The leases also stated that ARCO made no commitment regarding renewal at the end of 3 years, and that any new lease ARCO might offer could be a "substantially different form of business relationship".

In late 1979, ARCO created a new convenience store program known as "am/pm" and registered it as a franchise with the State. The am/pm and minimarket programs were similar in that both involved the operation of convenience stores on 3-year contracts. The two programs were also different. Unlike the minimarket lease, the am/pm franchise required ARCO to provide training, advertising, and merchandising services, imposed uniform standards of operation upon franchisees, and included the licensing of ARCO's registered "am/pm" service marks. The am/pm franchise and minimarket leases were also priced differently. The am/pm franchise required payment of a $10,000 franchise fee and a 1 percent advertising fee, whereas the minimarket leases did not. Finally, the am/pm franchise required payment by operators of a 14 percent royalty for stores operating on a 16-hour day and an 11 percent fee for stores open 24 hours a day.

ARCO began offering the am/pm franchise to appellants in December of 1979. Each appellant was given 45 days to review the offer and, if accepted, ARCO agreed to waive the

initial $10,000 franchise fee. Seven appellants accepted the am/pm franchise offer.

For the remaining four appellants[1] and other minimarket dealers who rejected the am/pm franchise, ARCO offered new 3-year minimarket leases as their existing leases expired. Under the new leases, ARCO increased the royalty fee to 14 percent. According to Larry Murphy and Stephen Schrader, ARCO's west coast region managers, the fee change reflected the increased cost of operating the program, the amounts charged by competitors, and the effects of double-digit inflation on real estate values. ARCO also stopped offering minimarket leases to new dealers to minimize customer confusion and competition between minimarket dealers and am/pm franchisees.

In June of 1980, the appellants filed suit alleging that ARCO, in its effort to convert mini markets to am/pm franchises, misinformed and failed to disclose material facts to prospective franchisees, and used economic coercion against them in violation of FIPA. Appellants sought damages for, among other things, loss of goodwill and payment of unfair fees.[2]

The case was set for trial in 1982. However, prior to trial the parties filed cross motions for partial summary judgment concerning whether the minimarket leases were "franchises" within the meaning of FIPA. The trial court ruled that the minimarket leases were subject to FIPA and was affirmed by this court on discretionary review. *Corp v. ARCO*, 45 Wn. App. 563, 726 P.2d 66 (1986), *review denied*, 108 Wn.2d 1014 (1987).

---

[1]Craig Corp, a named plaintiff in the original complaint, is not a party in this appeal.

[2]The four appellants who rejected the am/pm franchise are no longer affiliated with ARCO. At various times between 1981 and 1988 they sold the rights to the business, purchased the property from ARCO and continued to operate their own minimarkets, or ceased doing business because ARCO lost its rights to the leased property. Of the seven appellants who became am/pm franchisees, some have sold or transferred their franchises, others have started their own convenience store businesses, and a few are still am/pm franchisees. Three appellants have filed for bankruptcy.

On remand, the trial court set new discovery cutoff and trial dates. Pursuant to CR 16, the parties entered into a stipulation and pretrial order which limited appellants' claims to the following:

> (a) That with respect to those plaintiffs who entered into the "am/pm" franchise in 1980, ARCO terminated their mini-market franchise in violation of RCW 19.100.180(2)(j);[3]
> (b) That with respect to those plaintiffs who entered into the "am/pm" franchise in 1980, ARCO violated RCW 19.100-.170(2)[4] by misrepresenting that their mini-market agreements would be terminated or not renewed;
> (c) That with respect to those plaintiffs who declined to enter into "am/pm" franchise agreements, ARCO constructively terminated or non-renewed their mini-market franchise in violation of RCW 19.100.180(2)(i)[5] or (j) by deliberately and discriminatorily refusing to perform its contractual obligations under the Leases and Lease Addenda entered into with those plaintiffs;
> . . . .

Subsequent to the entry of this order, ARCO moved to dismiss appellants John and Helen Stertz. Although the Stertzes had been named in the initial complaint, they did

---

[3]Under RCW 19.100.180(2)(j), a franchisor may not:

"Terminate a franchise prior to the expiration of its term except for good cause. Good cause shall include . . . the failure of the franchisee to comply with lawful material provisions of the franchise or other agreement between the franchisor and the franchisee and to cure such default after being given written notice thereof and a reasonable opportunity, which in no event need be more than thirty days . . .. Upon termination for good cause, the franchisor shall purchase from the franchisee at a fair market value at the time of termination, the franchisee's inventory and supplies[.]"

[4]Under RCW 19.100.170(2), it is unlawful for a franchisor:

"To sell or offer to sell by means of any written or oral communication which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements made in light of the circumstances under which they were made not misleading."

[5]Under RCW 19.100.180(2)(i), a franchisor may not:

"Refuse to renew a franchise without fairly compensating the franchisee for the fair market value, at the time of expiration of the franchise, of the franchisee's inventory, supplies, equipment, and furnishings purchased from the franchisor, and good will . . . PROVIDED, That compensation need not be made to a franchisee for good will if (i) the franchisee has been given one year's notice of nonrenewal and (ii) the franchisor agrees in writing not to enforce any covenant [not to compete]."

not know they were a party until sometime in 1988. Prior to this time, the Stertzes had sold their am/pm franchise and executed a general release discharging ARCO:

> from any and all manner of obligations arising under the [existing am/pm agreement] and all other agreements ancillary thereto and from any and all manner of . . . claims which . . . [the Stertzes] ever had, now has, . . . or shall or may have . . . from the beginning of the world to the date of these presents. This does not apply to [the] existing lawsuit pending in federal court, *Thompson v. Arco*, [663 F. Supp. 206 (W.D. Wash. 1986)].

Based on this release, the trial court dismissed the Stertzes from the suit.

ARCO next brought a series of partial summary judgment motions directed at each of appellants' stipulated claims. ARCO first moved to dismiss appellants' claims, contending that it had neither terminated nor refused to renew appellants' leases as a matter of law because appellants continued to hold the right to use ARCO's trademark either as minimarket dealers or am/pm franchisees.

In response, appellants maintained that material issues of fact existed over whether ARCO had constructively terminated or refused to renew their minimarket leases. Appellants argued that the terms of the new minimarket leases were financially unreasonable and, in addition, were a breach of several oral promises made by ARCO early in the minimarket program. These promises were summarized in the affidavit of Richard Dawson, who stated that ARCO said it would (1) never increase royalty payments from 10 percent, (2) provide qualified representatives trained in the convenience store industry, (3) expand and make the minimarkets a nationwide chain of convenience stores, and (4) aggressively support them as part of the minimarket franchise agreement.

The trial court ordered dismissal of appellants' claims (a) and (c), concluding that because a renewal offer or offer to join as am/pm franchisees had been made in each case, as a matter of law ARCO did not terminate or refuse to renew appellants' minimarket leases under FIPA. In doing so, the court did not rule on ARCO's separate motion to strike Richard Dawson's affidavit.

ARCO next moved for summary judgment on claim (b) of the stipulation, that the am/pm appellants were induced to accept the am/pm franchise by ARCO's threatened refusal to renew their minimarket leases. ARCO argued that even if such a threat had been made, appellants had no actionable claim because (1) they knew before accepting the am/pm franchise agreements that ARCO would renew their minimarket leases, and (2) ARCO was entitled under the terms of the minimarket lease to refuse renewal.

The trial court granted ARCO's motion, concluding that ARCO was not required under any circumstances to renew the am/pm appellants' leases. This ruling effectively ended the case. Subsequently, however, appellants brought a CR 15 motion to amend their pleadings to add new claims against ARCO for, *inter alia*, (1) failure to register the minimarket offering pursuant to FIPA, (2) failure to make disclosures regarding the minimarket offerings 48 hours in advance pursuant to FIPA, (3) misstatements and nondisclosure in connection with the minimarket offerings in violation of FIPA, (4) failure to disclose to appellants that they could have continued to operate their ARCO petroleum franchises without having to operate minimarkets or am/pm stores, (5) violation of the duty of good faith and nondiscrimination stated in FIPA, and (6) failure of consideration.

Appellants argued that the requested amendment would not prejudice ARCO because the new claims were merely alternative theories of relief requiring no additional discovery. The trial court denied the motion, however, and directed the entry of judgment in favor of ARCO based on its previous rulings. Reconsideration was denied.

## II

The appellants appeal from the trial court's orders of partial summary judgment and its denial of appellants' motion to amend. Their principal claim on appeal is that both the am/pm and new minimarket franchise offerings contained terms substantially more onerous to appellants than their original minimarket franchise agreements. Thus, they claim

the new agreements constituted a termination or nonrenewal of their minimarket franchises under RCW 19.100.180(2)(i) and (j).

■ An appellate court reviews a summary judgment de novo. *Allen v. State*, 118 Wn.2d 753, 757, 826 P.2d 200 (1992). The court analyzes whether any genuine issues of material fact exist and whether the moving party is entitled to judgment as a matter of law. CR 56(c); *Central Wash. Bank v. Mendelson-Zeller, Inc.*, 113 Wn.2d 346, 351, 779 P.2d 697 (1989).

■ The Franchise Investment Protection Act was enacted in 1971 to protect franchisees from unfair practices in connection with the sale, execution, renewal or termination of franchise agreements. *Morris v. International Yogurt Co.*, 107 Wn.2d 314, 317, 729 P.2d 33 (1986); Chisum, *State Regulation of Franchising: The Washington Experience*, 48 Wash. L. Rev. 291, 297-98 (1972-1973). The act reflects the Legislature's recognition that "[t]he franchisor normally occupies an overwhelmingly stronger bargaining position and drafts the franchise agreement so as to maximize his power to control the franchisee." Chisum, 48 Wash. L. Rev. at 297.

In response to these problems, the act includes a "franchisee bill of rights". RCW 19.100.180. Under this section, although a franchisor may elect not to renew a franchise for any reason, the franchisor must provide compensation for the fair market value of the franchisee's inventory, supplies, equipment and furnishings purchased from the franchisor and for loss of goodwill. RCW 19.100.180(2)(i). In addition, a franchisor may not terminate a franchise prior to the expiration of its term except for good cause. Even when the termination is for good cause, the franchisor must purchase the franchisee's inventory and supplies. RCW 19.100.180(2)(j). In short, FIPA balances the need of the franchisor not to be locked into a clearly unprofitable franchise agreement, and the franchisee's need not to be at the franchisor's mercy in negotiating the continuation of the franchise relationship.

After the hearings on ARCO's motions for summary judgment, the trial court ruled that as a matter of law appellants could not proceed on their termination and nonrenewal theories because appellants were offered the option of remaining ARCO franchisees either under the am/pm or mini-market trademarks. The trial court presumably accepted ARCO's claim that this result was supported by *Coast to Coast Stores, Inc. v. Gruschus*, 100 Wn.2d 147, 667 P.2d 619 (1983). We do not agree.

At issue in *Coast to Coast* was whether a franchise was terminated when the franchisee's business was suspended by the franchisor's exercising its right to repossess the franchisee's inventory on default. *Coast to Coast*, 100 Wn.2d at 148. The court held that mere repossession of the inventory did not constitute a termination under RCW 19.100.180-(2)(j) since the franchise agreement itself had not yet expired. *Coast to Coast*, 100 Wn.2d at 153. However, the court did not address the question of the point at which the terms of a purported franchise "renewal" so depart from the original franchise terms that a constructive termination or nonrenewal has occurred.

As we have noted, FIPA contemplates a balance between protecting franchisees from unfair negotiation practices and recognizing the franchisor's legitimate business interests. The act achieves this balance by permitting a franchisor to end a franchise relationship, but requiring *limited* compensation to the franchisee upon doing so. Here, the appellants claim that ARCO has in effect ceased their original franchise relationship. In rejecting this claim, the trial court essentially ruled that ARCO's offer to continue or, in the case of am/pm, commence a franchise relationship on *any* basis was sufficient to avoid the compensation provisions of FIPA. This was error.

We hold that the trier of fact must examine the proposed changes in a new franchise offer and determine whether the new terms vary so substantially from those in the original franchise agreement and so significantly diminish the franchisees' rights thereunder as to constitute new

agreements, not "renewals" of existing franchise agreements. We recognize that this analysis may tie the franchisor into the basic concept of the original franchise agreement more than the franchisor would find desirable. However, the franchisor's remedy is simply to terminate or nonrenew the franchise and to provide the franchisee the limited statutory compensation due. If we were to read the statute as did the trial court, a franchisor could easily avoid the compensation requirements of FIPA by submitting any offer of renewal, no matter how different and how onerous on the franchisee. This would result in absolutely no protection to the franchisee and make the statute solely for the benefit of the franchisor. Our holding requiring the franchisor to compensate the franchisee for essentially ending the franchise relationship as it existed is the tradeoff for the limited remedies provided to the franchisee in RCW 19.100-.180(2)(i) and (j).

Here, the appellants argue and the record evidences numerous differences between the terms and conditions of the two franchise offers presented to appellants in 1979-80 and those of the original minimarket franchises. Whether these changes substantially affect the franchisees' rights so as to constitute an essentially new franchise offer must be decided by a trier of fact on a more complete record. Hence, we reverse the grant of summary judgment and remand for the trial court to determine on appropriate evidence whether the franchise offers made by ARCO so departed from the original franchise agreement as to constitute a termination or nonrenewal of the franchise agreement. If so, the applicable statutory remedies are triggered.

Finally, we note that our analysis will require the trial court to rule on the Dawson affidavit's admissibility, which was left unresolved below. Specifically, the court will have to decide whether ARCO in fact made oral promises to appellants and, if so, whether these promises were a part of the terms of the original franchise agreement.[6]

---

[6]We affirm the trial court's dismissal of the am/pm appellants' stipulated claim (b) that ARCO violated RCW 19.100.170(2) by misrepresenting that their

### III

Appellants also challenge the trial court's denial of their CR 15 motion to modify their complaint and pretrial stipulation. Noting that amendments by leave should be freely given, they contend that ARCO would not be prejudiced since the asserted claims were merely alternative theories of relief which required no new discovery.

██ ██ As an initial matter, the parties disagree whether appellants' motion to amend is governed by CR 15[7] or CR 16.[8] This dispute, however, is of little significance here.

---

minimarket agreements would be terminated or nonrenewed. Appellants admit to being told or learning that they would be offered new minimarket agreements and, thus, could not have reasonably relied on any representations to the contrary. Although we reject ARCO's contention that the language of the minimarket leases permitting it to vary the terms of the new franchise agreements controls, FIPA does permit ARCO to discontinue appellants' franchises provided they receive compensation. Thus, the central issue remains whether appellants were terminated or nonrenewed.

[7] CR 15 provides in part:

"**(a) Amendments.** . . . [A] party may amend his pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires. . . .

"**(b) Amendments To Conform to the Evidence.** When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time . . .."

[8] CR 16 provides in part:

"**(a) Hearing Matters Considered.** By order, or on the motion of any party, the court may in its discretion direct the attorneys for the parties to appear before it for a conference to consider:

"(1) The simplification of the issues;

"(2) The necessity or desirability of amendments to the pleadings;

" . . . .

"**(b) Pretrial Order.** The court shall make an order which recites the action taken at the conference, the amendments allowed to the pleadings, and the agreements made by the parties as to any of the matters considered, and which limits the issues for trial to those not disposed of by admissions or agreements of counsel; and such order when entered controls the subsequent course of the action, unless modified at the trial to prevent manifest injustice. . . ."

Under CR 15(a), "leave [for amendment] shall be freely given *when justice so requires*". (Italics ours.) Similarly, under CR 16(b), if a new issue is introduced after the parties have entered into a pretrial order, the trial court may consider the issue and modify the order to prevent "manifest injustice". *Esmieu v. Schrag*, 92 Wn.2d 535, 538, 598 P.2d 1366 (1979); *Anderson v. Section 11, Inc.*, 28 Wn. App. 814, 817, 626 P.2d 1027 (1981). Thus, under either rule, the ultimate decision whether justice will permit amendment is a matter within the trial court's discretion. *Culpepper v. Snohomish Cy. Dep't of Planning & Comm'ty Dev.*, 59 Wn. App. 166, 169, 796 P.2d 1285 (1990), *review denied*, 116 Wn.2d 1008 (1991).

In denying the motion to amend, the trial court reasoned:

> I feel compelled to enforce the bargain that I believe that counsel entered into by the plain writing of the stipulation. I believe that the words at least to me appear to be very carefully drafted . . . Specific paragraphs [of FIPA] were enumerated, and it's obvious from the stipulation that other claims were given up . . . That pretrial order sets out the blueprints for how it is that I would proceed with you during the next two years of litigation. It is quite obvious to that court that at least Mr. Berry was systematically working his way through that order to eliminate the plaintiff's [*sic*] claims, systematically broad summary judgment on each category: A, B and C. . . . It was obvious to me what it is he was trying to do and it is obvious to me that when he got to C he was going to say we are done. . . . [Thus,] I find that this case is at its end . . . And it cannot be amended even though an amendment should be freely given [when] at this point in time we are so close to what was originally set as our trial date. I find that it would be extraordinarily difficult after the parties have sat back and waited to resurrect the discovery at this point because it appears to the Court that we were going to decide this case principally on legal issues and that we were working through them on a systematic basis.

These statements clearly evidence the trial court's belief that appellants agreed to proceed only on their stipulated claims. The court's assessment has ample support in the record. Accordingly, the denial of appellants' motion to amend after their claims had been dismissed did not constitute an abuse of discretion.

## IV

Finally, appellants John and Helen Stertz challenge their dismissal from the case based on the release executed during the 1987 sale of their am/pm franchise.

■ In general, releases are contracts, their construction is governed by the legal principles applicable to contracts, and they are subject to judicial interpretation based on the language used. *Vanderpool v. Grange Ins. Ass'n*, 110 Wn.2d 483, 488, 756 P.2d 111 (1988) (citing *Stottlemyre v. Reed*, 35 Wn. App. 169, 171, 665 P.2d 1383, *review denied*, 100 Wn.2d 1015 (1983)). Recently, the Supreme Court held that as an aid in ascertaining the intent of contracting parties, a trial court may admit extrinsic evidence relating to the entire set of circumstances under which the contract was formed. *Berg v. Hudesman*, 115 Wn.2d 657, 667, 801 P.2d 222 (1990).

■ Here, the Stertzes have submitted affidavit testimony stating that when they signed the 1987 release, they did not intend to discharge ARCO from any pending litigation. This intention, the Stertzes assert, is evidenced by the language in the release excepting their involvement in *Thompson v. ARCO*, 663 F. Supp. 206 (W.D. Wash. 1986). However, it is undisputed that the Stertzes had no knowledge of this action at the time they executed the release. Moreover, although named in the caption of the complaint, neither plaintiffs' counsel nor ARCO considered them a party.[9] Under these circumstances, the court did not err in dismissing the Stertzes from the case.

WEBSTER, A.C.J., and AGID, J., concur.

Review granted at 121 Wn.2d 1001 (1993).

---

[9]When asked by the trial court why ARCO did not move to dismiss the Stertzes earlier, counsel responded:

"Probably, in retrospect, that should have been done. I can't speak for [original counsel], and I wasn't involved at that time, but I think [counsel's] reasoning was, if he's not a party, he's not a party. There's no reason to dismiss someone who's not a party."