[No. 51979-0.   En Banc.   December 4, 1986.]

VERNON M. MORRIS, ET AL, *Petitioners,* v. INTERNATIONAL YOGURT COMPANY, ET AL, *Respondents.*

*James A. Krueger* and *Kane, Vandeberg, Hartinger & Walker,* by *James R. Verellen,* for petitioners.

*Bertha B. Fitzer, Rush, Kleinwachter, Hannula & Harkins,* and *William J. Rush,* for respondents.

*Kenneth O. Eikenberry, Attorney General,* and *Jeffrey O. C. Lane, Senior Assistant,* amici curiae.

DURHAM, J.—Vernon and Marilyn Morris appeal from a Court of Appeals decision holding that the respondent,

International Yogurt Company (IYC) did not violate the Franchise Investment Protection Act (FIPA), RCW 19.100, when it sold them a franchise. The Morrises contend that IYC violated FIPA by failing to comply with the statute's requirements for exemption from registration and by failing to disclose to them a material fact concerning the franchise.

On June 21, 1977, Vernon and Marilyn Morris entered into a franchise agreement with International Yogurt Company. In the agreement, IYC granted the Morrises a franchise to operate a store to sell frozen yogurt and related products under IYC's trade name, "The Yogurt Stand". The franchise agreement also granted the Morrises the right to purchase and use IYC's yogurt mix. The agreement stated that "[t]he yogurt mix . . . is unique, and its formula and process for manufacture may be regarded as a trade secret." Before the execution of the franchise agreement, IYC gave the Morrises a copy of a franchise offering circular, which it had completed on May 1, 1977. The franchise offering circular stated, "The yogurt mix used in the preparation of 'The Yogurt Stand' frozen yogurt is considered a unique and special formula . . ."

The yogurt mix had been developed by Darigold Farms according to IYC's specifications, but at the time IYC entered into the agreement with the Morrises, Darigold was also selling the mix to other customers. Neither the franchise agreement nor the offering circular stated that the mix was available to anyone other than IYC and its franchisees.

IYC did not disclose to the Morrises in writing the name and address of its agent in Washington authorized to receive process.

The franchise which the Morrises acquired was the first "Yogurt Stand" franchise granted by IYC. At the time it sold the franchise to the Morrises, IYC had not registered its franchise offer. Instead, IYC claimed an exemption from registration under RCW 19.100.030(4)(a) and (b)(ii).

Sometime during the spring of 1977, IYC arranged for an advertisement in the yellow pages of the 1977 Tacoma tele-

phone directory under the heading of "restaurants".[1] The ad stated:

YOGURT STAND THE
FROZEN YOGURT
BUSINESS OPPORTUNITIES
5115–101 Street S.W.—584–3535

The 1977 Tacoma telephone directory was distributed to the general public beginning in August 1977.

On December 9, 1977, IYC did register its franchise offer. Before it registered, IYC did not offer to sell more than 10 franchises. After registration, IYC continued to offer franchises and sold them to a number of franchisees.

The Morrises held their franchise for approximately 3 years. The franchise never succeeded financially and they sold it in June 1980 for a loss. After they sold the franchise, the Morrises brought this action alleging securities fraud, common law fraud, negligent misrepresentation, and violations of FIPA and the Consumer Protection Act. The trial court dismissed the action and awarded IYC attorney fees and costs.

The Morrises appealed. The Court of Appeals affirmed and awarded attorney fees on appeal to IYC. *Morris v. International Yogurt Co.*, 41 Wn. App. 226, 703 P.2d 318 (1985). Judge Petrich concurred. This court granted the Morrises' petition for review of the issues concerning alleged violations of FIPA.

The Franchise Investment Protection Act, RCW 19.100, was enacted to deal with sales abuses and unfair practices in the franchising of goods and services. *See generally* Chisum, *State Regulation of Franchising: The Washington*

---

[1]The Court of Appeals stated that IYC arranged for the ad sometime between April and July 1977. *Morris v. International Yogurt Co.*, 41 Wn. App. 226, 230, 703 P.2d 318 (1985). However, the trial record and findings indicate only that the ad was ordered sometime in the spring before July 1977. There is no specific record as to when the ad was placed. However, a telephone company employee testified that the company generally stopped accepting advertising for the 1977 directory on April 22, 1977, although it could accept ads until July 1, 1977, depending on the circumstances.

*Experience,* 48 Wash. L. Rev. 291, 334–90 (1973). To protect against sales abuses, FIPA generally requires franchisors to register franchise offers with the State and to disclose material information to prospective franchisees. RCW 19.100.020, .040, .170. *See also* Chisum, 48 Wash. L. Rev. at 352–69.

The first issue we address is if IYC violated FIPA requirements for exemption from registration. FIPA provides that it is unlawful for a franchisor to sell or offer to sell a franchise in Washington unless the offer has been registered with the Department of Licensing or exempted from registration. RCW 19.100.020. RCW 19.100.030 provides for various types of exemptions from FIPA's registration requirements. When IYC offered a franchise to the Morrises, it claimed an exemption from registration under RCW 19.100.030(4)(a) and (b)(ii). Under these provisions, the franchisor must satisfy certain conditions to be exempt from registration. The Morrises argue that IYC failed to meet the requirements of RCW 19.100.030(4)(a) and (b)(ii).

First, the Morrises contend that IYC violated RCW 19.100.030(4)(a) by failing to disclose the name and address of its agent in Washington authorized to receive process. To qualify for exemption from registration under RCW 19.100.030(4), a franchisor must disclose certain information in writing to a prospective franchisee, at least 48 hours before the execution by the franchisee of a binding franchise or other agreement, or at least 48 hours before the receipt of any consideration. RCW 19.100.030(4)(a). The information required includes the name and address of the franchisor's agent in Washington authorized to receive process. RCW 19.100.030(4)(a)(ii).

IYC does not dispute that it did not disclose the name and address of its agent to the Morrises. Thus, it appears that IYC violated the statutory requirement for such disclosure. The trial court, however, found that IYC had "substantially complied" with the exemption requirements.

■ The Morrises argue that a franchisor must be required to comply strictly with all of FIPA's exemption

requirements in order to qualify for an exemption. We agree that strict compliance with the exemption requirements is necessary. To do otherwise would ignore the statute's plain language and intent. The exemption provisions are exceptions to FIPA's basic requirement of registration of franchise offers. They must be strictly followed in order to effectuate FIPA's general policy of requiring registration to protect potential franchisees. Furthermore, a substantial compliance doctrine would create uncertainty about the level of compliance required. A clear standard is necessary for effective enforcement of FIPA. We conclude that IYC violated FIPA's requirements for exemption from registration by not disclosing the name and address of its agent to the Morrises, and, therefore, was not exempt from registration when it sold them the franchise.

We must further consider, however, if any remedy is available to the Morrises for such violation. RCW 19.100-.190(2) provides, in part: "Any person who sells or offers to sell a franchise in violation of this chapter shall be liable to the franchisee or subfranchisor who may sue at law or in equity for damages caused thereby for rescission or other relief as the court may deem appropriate." Rescission would normally be a proper remedy for a violation of the exemption requirements. *See* Chisum, 48 Wash. L. Rev. at 384. However, in this case, rescission is unavailable because the Morrises sold their franchise business.

As for damages, RCW 19.100.190(2) states that the franchisee may sue a person who sells a franchise in violation of FIPA "for damages *caused thereby*". (Italics ours.) Thus, the franchisee must show that the violation actually caused him to suffer damages, not merely that a violation occurred. The Morrises have not shown the requisite causation, and, therefore, have no remedy for this statutory violation.

In summary, although IYC did violate the requirements in RCW 19.100.030(4)(a) for exemption from registration, and was neither registered nor exempt from registration when it sold the Morrises their franchise, we conclude that no relief is available to the Morrises for such violation.

The Morrises' second argument is that IYC violated the requirements for exemption from registration in RCW 19.100.030(4)(b)(ii). A franchisor may claim an exemption under this provision if he:

(ii)(A) has and is offering for sale fewer than ten franchises within the State of Washington under franchise agreement; and

(B) does not advertise, using radio, television, newspaper, magazine, billboard, or other advertising medium the principal office of which is located in the state of Washington or Oregon, concerning the sale of or offer to sell franchises . . .

The Morrises argue that, by arranging for the ad in the telephone directory, IYC violated the prohibition on advertising and, therefore, could not claim an exemption from registration under RCW 19.100.030(4)(b)(ii). The Court of Appeals, however, held that IYC had not advertised at the time it sold the franchise to the Morrises. The court reasoned that advertising requires dissemination of information. It held that because the telephone directory had not yet been distributed when IYC sold the franchise to the Morrises, IYC had not advertised at that time. *Morris v. International Yogurt Co.*, 41 Wn. App. 226, 230, 703 P.2d 318 (1985).

The Morrises propose a different interpretation of the advertising prohibition. They assert that RCW 19.100-.030(4)(b)(ii) is directed toward the exemption of franchisors engaged in a limited level of activity. They argue that when a franchisor takes all of the steps necessary to accomplish the advertisement of franchises for sale, he is engaged in a level of activity for which he should be required to be registered under FIPA. The Morrises assert that in this case, IYC had taken all the necessary steps to obtain the ad in the Tacoma telephone directory at the time it sold them the franchise, and the fact that the directory was not distributed until after that sale does not mean that IYC had not engaged in advertising for purposes of precluding an exemption from registration.

We conclude, however, that the Court of Appeals correctly decided the issue. "Advertise" is generally defined in terms of communication to others.[2] FIPA defines "advertisement" as "any written or printed communication or any communication by means of recorded telephone messages or spoken on radio, television, or similar communication media published in connection with an offer or sale of a franchise." RCW 19.100.010(1). FIPA also states, "'Publish' means publicly to issue or circulate by newspaper, mail, radio, or television or otherwise to disseminate to the public." RCW 19.100.010(13). These definitions contemplate communication to the public. In addition, considering that a primary purpose of FIPA is to protect the public from sales abuses by franchisors, a franchisor should not be precluded from the exemption in RCW 19.100.030(4)(b)(ii) until any notice for which it has arranged is actually disseminated to the public.

We conclude that IYC had not advertised an offer at the time it sold the franchise to the Morrises, because, at that time, the telephone directory had not been distributed to the public. The Court of Appeals decision that IYC did not violate the exemption requirements in RCW 19.100.030-(4)(b)(ii) is affirmed.

The next issue we must consider is if IYC violated FIPA by failing to disclose to the Morrises that the yogurt mix was available to nonfranchisees. RCW 19.100.170 provides, in part:

It is unlawful for any person in connection with the offer, sale, or purchase of any franchise directly or indirectly:

. . .

(2) To sell or offer to sell a franchise in this state by

---

[2]*Webster's Third New International Dictionary* 31 (1971) provides the following definitions of "advertise": "1 a: to make known to (someone): give notice to . . . 2: to make generally known: call attention to: give notice of: a: to give publicity to . . . b: to make conspicuous . . . c (1): to give public notice of: announce publicly esp. by a printed notice or through a radio or television broadcast . . . (2): to call public attention to esp. by emphasizing desirable qualities so as to arouse a desire to buy or patronize . . ."

means of any written or oral communication which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements made in light of the circumstances under which they were made not misleading.

The Morrises argue that the fact that the yogurt mix was available to nonfranchisees was material, because a reasonable person would consider that fact important in deciding if he should purchase a franchise.

The Court of Appeals held that IYC had not violated RCW 19.100.170(2) by failing to disclose the availability of the mix. It reasoned that IYC had not given the Morrises any reason to believe that exclusive rights to the yogurt mix had been promised, observing that IYC had not even guaranteed that the Morrises would have the only yogurt stand within a given area.[3] It concluded that there was no reasonable basis for the Morrises to presume that the yogurt mix would not be available to others, and, therefore, that IYC could not be held responsible for a mistake which it neither caused nor had reason to suspect. *Morris*, at 228–29.

Judge Petrich, however, disagreed with the majority's analysis. He reasoned,

> It may be true that the particular yogurt mix was unique . . . Nevertheless, the statement that there was available a unique product to a franchisee who paid a fee and agreed to the terms of a franchise agreement is at the least misleading without disclosing the fact that the same product which is the essence of the franchise is available to anyone for the asking.

*Morris*, at 233 (Petrich, J., concurring). He concluded that "this information would be a critical factor in deciding whether or not to purchase the franchise." *Morris*, at 233 (Petrich, J., concurring).

■ Initially, we must determine when a fact is material under RCW 19.100.170(2). This provision is essentially the

---

[3]The Court of Appeals erroneously stated that IYC gave no such guaranty to the Morrises. Both the offering circular and the franchise agreement provided that the franchisee would have an exclusive territory of at least one–quarter mile radius from its franchised location.

same as the antifraud provision in the Securities Act of Washington, RCW 21.20.010(2).[4] For purposes of the latter provision, a "material fact" is "'a fact to which a reasonable man would attach importance in determining his choice of action in the transaction in question.'" *Clausing v. DeHart,* 83 Wn.2d 70, 73, 515 P.2d 982 (1973) (quoting *Shermer v. Baker,* 2 Wn. App. 845, 855, 472 P.2d 589 (1970)). In the context of the Securities Act, the issue of materiality has been treated as a question of fact. *See Clausing v. DeHart, supra.* Since the court had already applied this standard to the securities act provision at the time FIPA was enacted, *see Shermer v. Baker, supra,* we apply the same standard to the similar FIPA provision. *See* Chisum, *State Regulation of Franchising: The Washington Experience,* 48 Wash. L. Rev. 291, 368–69 (1973).

Our analysis of materiality in this case begins with a review of the trial court's findings of fact. The trial court found that at the time the Morrises signed the franchise agreement, Darigold was selling the yogurt mix not only to IYC but also to others. Unfortunately, the trial court's additional findings of fact concerning the yogurt mix are incomplete. However, the court clearly found that the yogurt mix was manufactured by Darigold according to IYC's specifications and was unique.[5] As the Court of

---

[4]RCW 21.20.010 provides in part: "It is unlawful for any person, in connection with the offer, sale or purchase of any security, directly or indirectly:

". . .

"(2) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading . . ."

[5]Finding of fact 32 states: "The Court finds that the yogurt mix, which was manufactured to the specifications of International Yogurt by the Darigold Company, that it was agreed with the Consolidated Dairies, subsidiary of Darigold, that lactobacillus acidophilus would be added, but from a practical standpoint this was a new product for the Darigold Company and they would need a certain volume to make it pay. Initially the product did not have lactobacillus acidophilus; that the original Darigold mix was and always had been a unique product and *that it had been made to the Yogurt Stand's specifications and the product* that Darigold distributed was a product that had been made to the International Yogurt Stand's specifications." (Italics ours.)

Appeals observed, there is substantial evidence in the record to support this finding. Therefore, IYC's statements in the franchise agreement and offering circular that the yogurt mix was unique did not constitute misrepresentations.

The next question is if IYC's failure to disclose to the Morrises that the yogurt mix was available to nonfranchisees was an omission of a material fact. In order to determine if a reasonable person would consider this fact important in purchasing the franchise, it is necessary to consider initially the importance of the yogurt mix itself to the potential franchisee.

The evidence in the record indicates that the yogurt mix was an essential element of the franchise. First, the franchise agreement placed particular emphasis on the fact that, in exchange for purchasing an IYC franchise, the franchisee would obtain the right to purchase and use a special yogurt mix. The agreement goes to considerable length in discussing the yogurt mix. Section 9 of the agreement states in part:

> The yogurt mix to be used in the preparation of all frozen yogurt sold at the Franchised Location is unique, and its formula and process for manufacture may be regarded as a trade secret. The right to purchase and use the mix is granted to Franchisee pursuant to this Agreement.

Thus, the agreement clearly indicates that the right to purchase this one–of–a–kind yogurt mix is a key feature of the franchise.[6]

Section 9 of the agreement further provides that the franchisor will make the formula for the manufacture of the mix available to certain dairy manufacturers, which shall be

---

[6]The agreement also grants the franchisee the right to use the franchisor's trademarks and states that the franchisor will provide training to the franchisee. Thus, the right to purchase the yogurt mix was not the only consideration received for the purchase of the franchise. However, since the agreement's discussion of the yogurt mix was at least as prominent and detailed as its discussion of these other items, it cannot be denied that the right to purchase the mix was as significant an element of consideration.

regarded as approved sources from which the franchisee will purchase the mix. If the franchisee wishes to purchase the mix from a different manufacturer, he must request in writing that the franchisor disclose the formula and process for manufacture to that manufacturer. The agreement further states:

Franchisor shall exercise its reasonable good business judgement in determining whether the formula and process should be disclosed to that manufacturer, *taking into consideration such factors as that manufacturer's ability to produce a mix of satisfactory quality, and that manufacturer's ability to adequately protect the formula and process from disclosure to unauthorized persons.*

(Italics ours.) By suggesting that IYC will limit access to the formula for the yogurt mix, this provision reinforces the fact that the mix is significant to IYC's product.

IYC contends that because the final product that went to the consumer contained both the yogurt mix and flavorings blended according to procedures specified by IYC, the yogurt mix alone was not an essential element of the franchise. We recognize that the trial court found that IYC spent much time testing and flavoring the final product that was sold to the consumer, and that it was the finished product that was significant to the consumer.[7] Indeed, there is evidence in the record to support this finding.[8]

___

[7] Finding of fact 33 states: "The Court further finds that this is the final product which again is significant to the consumer and that International Yogurt spent significant time in sampling and flavoring the eventual product that went to the consumer so that it would have a distinguished, distinct characteristic."

[8] At trial, IYC officials testified that they took care to devise the proper proportions of flavoring to yogurt mix, that they tested many flavors, and that they provided recipes to franchisees for the ratios of flavoring to yogurt mix. There was also testimony that the yogurt mix itself was not palatable to most people.

It should also be noted, however, that other testimony indicates that the flavoring and its amount were not necessarily crucial to the final product. Several individuals testified that IYC franchisees served plain yogurt, which consisted of the yogurt mix without flavorings. Furthermore, Marilyn Morris testified that while adding flavor to the yogurt mix would make the yogurt different from the plain, if the amount of flavoring was varied up to an ounce or two, it wouldn't make that much difference.

Nevertheless, this fact does not diminish the importance of the yogurt mix to the final product. The evidence also clearly shows that this particular yogurt mix was a fundamental ingredient contributing to the special quality of the final product. The record is replete with testimony indicating the high priority the Hannas placed on developing a yogurt mix with the proper characteristics. Both John Hanna and a Darigold official testified that the Hannas worked with Darigold at length in developing the yogurt mix, testing it repeatedly until they achieved a mix with the specific taste and texture they sought. Clearly, IYC considered its yogurt mix to be a critical aspect of its product and its business.[9]

In summary, the evidence as a whole indicates that the yogurt mix as well as the flavoring contributed to the distinctiveness of IYC's final product. We are unable to find any specific line of demarcation between which ingredients and processes did or did not make the final product what it was. However, it is clear that IYC's yogurt mix was not a fungible ingredient which could be interchanged with any other yogurt mix to achieve the same result. Rather, this yogurt mix was a major essential element of IYC yogurt.

Considering this along with the fact that the franchise agreement emphasized the uniqueness of the yogurt mix and its importance to the franchise, we find that the yogurt mix was a significant factor to potential franchisees. In light of these circumstances, IYC's failure to disclose to the Morrises the availability of the yogurt mix to nonfranchisees was an omission of a material fact. In deciding whether

---

[9]Terry Oftedal, IYC's marketing manager, testified as follows with respect to the yogurt mix:

"Q. Now, Mr. Oftedal, did you ever discuss with franchisees or potential franchisees The Yogurt Stand secret formula?

"A. I had no knowledge of the secret formula other than that we had a unique—as we state in the offering circular—we had a unique formula which we felt was part of the reason that made our store so popular.

"Q. And when you were referring to the unique formula, are you referring to the yogurt mix itself as being unique?

"A. Yes."

to purchase the franchise, a reasonable person reading the franchise agreement would have considered it important that the same yogurt mix was available to persons not purchasing the franchise. The fact that an essential component of the franchise's major product is unique and considered a trade secret is of far less value to the potential franchisee if that ingredient is generally available to all persons whether or not they have purchased the franchise. A person might not consider it worthwhile to invest in the franchise if he knew he could obtain the mix without paying the franchise fee. For these reasons, we conclude that IYC's failure to disclose to the Morrises the availability of the yogurt mix to nonfranchisees was an omission of a material fact necessary to make the statements IYC made not misleading, and, therefore, was a violation of RCW 19.100.170(2).

The question remains if any remedy is available to the Morrises for IYC's failure to disclose a material fact in violation of RCW 19.100.170(2). FIPA's provision on damages states that a person who sells a franchise in violation of the statute "shall be liable to the franchisee . . . who may sue at law or in equity for damages caused thereby". RCW 19.100.190(2). The Court of Appeals concluded that, even if IYC had violated the statute by failing to disclose a material fact, the Morrises could not recover damages for the violation. It reasoned that the Morrises had the burden of proving that their losses resulted from the lack of exclusive access to the mix, and they had not met that burden. *Morris v. International Yogurt Co.,* 41 Wn. App. 226, 229, 703 P.2d 318 (1985).

The Morrises advocate a different approach. They contend that proof of the franchisor's failure to disclose a material fact itself establishes causation in fact and entitles the franchisee to recover damages consisting of the franchise fee, other out–of–pocket costs, and consequential damages which it would not have incurred but for its investment in the franchise. The Morrises rely on *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 31 L. Ed. 2d 741, 92 S. Ct. 1456 (1972), in which the United States

Supreme Court addressed the elements of proof necessary for recovery in an action under the Securities and Exchange Commission's rule 10b–5. Among other things, rule 10b–5 provides that it is unlawful for a person to omit a material fact in connection with the purchase or sale of any security. 17 C.F.R. § 240.10b–5 (1985). In *Affiliated Ute Citizens,* the Court stated,

> Under the circumstances of this case, involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision. . . . This obligation to disclose and this withholding of a material fact establish the requisite element of causation in fact.

(Citations omitted.) 406 U.S. at 153–54.

The Court did not elaborate on the reasons for the rule it adopted in *Affiliated Ute Citizens.* However, it is generally said that the rationale is that it is virtually impossible to prove reliance in cases alleging nondisclosure of material facts. The inquiry that would normally be made in a case of affirmative misrepresentation—did the plaintiff believe the defendant's representation, and did that belief cause the plaintiff to act—does not apply in a case of nondisclosure. *Wilson v. Comtech Telecommunications Corp.,* 648 F.2d 88, 92 n.6, 93 (2d Cir. 1981). Since there is no affirmative representation in a nondisclosure case, a plaintiff who was required to prove reliance would have to show that he believed the opposite of the omitted fact, and this would be practically impossible to prove. *Wilson v. Comtech Telecommunications Corp., supra. See also* Note, *The Reliance Requirement in Private Actions Under SEC Rule 10b–5,* 88 Harv. L. Rev. 584, 590 (1975).

██ In considering the *Affiliated Ute Citizens* rule, it is important to note how lower federal courts have interpreted it. According to many federal courts, the rule does not mean that proof of omission of a material fact conclusively resolves the causation question, but rather that it

establishes a rebuttable presumption of reliance. The defendant may rebut the presumption by proving that the plaintiff's decision would have been unaffected even if the omitted fact had been disclosed. *See, e.g., Lipton v. Documation, Inc.*, 734 F.2d 740, 742 (11th Cir. 1984), *cert. denied*, 469 U.S. 1132 (1985); *Rifkin v. Crow*, 574 F.2d 256, 262 (5th Cir. 1978). The weight of opinion in the federal courts supports the rebuttable presumption of reliance. Commentators have also advocated this interpretation. *See* Note, 88 Harv. L. Rev. at 597–600.

The federal approach adopting a rebuttable presumption of reliance under rule 10b–5 in cases of nondisclosure of a material fact makes sense. If plaintiffs were required to prove reliance on an omission of material fact, defendants who should be held accountable for their failure to disclose material facts could escape liability, given the difficulties of such proof. On the other hand, if causation in fact is conclusively established by proof of nondisclosure of a material fact, some plaintiffs who did not actually rely on the nondisclosure might recover undeservingly. However, if proof of nondisclosure of a material fact establishes a presumption of causation and the defendant is given the opportunity to rebut the presumption, the risk of recovery by undeserving plaintiffs will be reduced. Advocates of the rebuttable presumption acknowledge that the defendant may encounter similar difficulties in proving nonreliance as those the plaintiff would face in proving reliance. However, since it is the defendant's nondisclosure that has made proof difficult, it is proper to require the defendant to bear such difficulties. *See* Note, 88 Harv. L. Rev. at 590–91.

It is reasonable to apply this standard to cases involving a franchisor's failure to disclose a material fact in violation of FIPA. First, the language in RCW 19.100.170(2) concerning the omission of a material fact is virtually identical to the corresponding language in rule 10b–5.[10] Thus, it is

---

[10]Rule 10b–5 states in part:

"It shall be unlawful for any person, directly or indirectly, by the use of any

appropriate to look to the federal courts' construction of the securities rule for guidance in interpreting the FIPA provision. Second, the fact that RCW 19.100.190(2) states that the franchisee may sue a person who violates FIPA "for damages caused thereby" does not preclude adoption of a rebuttable presumption of reliance. Such a standard does not eliminate the element of causation; it simply governs how that element is proved. *See* Note, 88 Harv. L. Rev. at 598. Finally, the reasons for adopting the rule are as strong in the context of FIPA as under rule 10b–5. The rule accounts for the problems inherent in requiring the plaintiff to prove that he relied on the nondisclosure of a material fact, while still giving the defendant the opportunity to show that, in a particular case, there was in fact no reliance.

We hold, therefore, that in an action alleging the omission of a material fact in violation of RCW 19.100.170(2), proof of nondisclosure of a material fact establishes a presumption of reliance which the defendant may rebut by proving that the plaintiff would still have purchased the franchise even if the material fact had been disclosed. This case is remanded to the trial court to determine, in a manner consistent with this opinion, if IYC's failure to disclose to the Morrises the availability of the mix to nonfranchisees caused the Morrises to suffer damages.

In summary, we hold that while IYC violated FIPA by selling the Morrises a franchise without complying with RCW 19.100.030(4)(a)'s requirements for exemption from registration, no relief is available to them for such violation. We also affirm the Court of Appeals decision that IYC did not violate the exemption requirements of RCW 19.100-.030(4)(b)(ii) when it arranged for an advertisement in the

means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

" . . .

"(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . ." 17 C.F.R. § 240.10b–5 (1985).

telephone directory. Finally, we reverse the Court of Appeals decision that IYC did not omit a material fact in violation of RCW 19.100.170(2) when it failed to disclose to the Morrises the availability of the yogurt mix to nonfranchisees. We remand the case to the trial court to decide if the Morrises may recover damages for IYC's violation of RCW 19.100.170(2), according to the principles in this opinion.

DOLLIVER, C.J., and UTTER, BRACHTENBACH, DORE, PEARSON, ANDERSEN, CALLOW, and GOODLOE, JJ., concur.

Reconsideration denied June 2, 1987.