[No. 64241-3-I. Division One. June 1, 2010.]

SOMETHING SWEET, LLC, ET AL., *Appellants*, v. NICK-N-WILLY'S FRANCHISE COMPANY, LLC, ET AL., *Respondents.*

---

[71] *See Perez*, 989 F.2d at 1115-16 (citing *Yates*, 500 U.S. at 404-06).

*Howard R. Morrill* (of *Simburg, Ketter, Sheppard & Purdy LLP*), for appellants.

*Matthew T. Boyle* (of *Mitchell Lang & Smith*); and *Joel E. Wright* and *Rosemary J. Moore* (of *Lee Smart PS*), for respondents.

¶1 LAU, J. — Kirk and Jill Brandenburg, owners of a Nick-N-Willy's pizza store franchise, sued Nick-N-Willy's

and its King County developers, Michael and Patti Moore, based on alleged violations of the Franchise Investment Protection Act, chapter 19.100 RCW. The Brandenburgs claimed that Nick-N-Willy's failed to disclose a material fact in violation of RCW 19.100.170(2) and that the Moores were subfranchisors who failed to properly register a franchise offering with the state. The superior court dismissed these claims on summary judgment. We affirm.

## FACTS

¶2 Nick-N-Willy's Franchise Company LLC sells two types of franchises. The first type is for operating Nick-N-Willy's pizza stores, which includes two basic models. The "outlet" model sells only "take-and-bake pizzas," which are preassembled but unbaked pizzas. Customers are expected to take these pizzas home and use their own ovens to bake them. The "restaurant" model sells both take-and-bake pizzas and prepared pizzas that customers can eat at the store.

¶3 The second type of franchise is for "area development marketing." An area development marketing franchisee buys the right to solicit and recruit potential Nick-N-Willy's store franchisees in a given geographic region. The area developer is also required to provide support services to Nick-N-Willy's store franchisees in the specified area.

¶4 Michael Moore bought an area development marketing franchise covering King County in July 2005.[1] He contacted Kirk and Jill Brandenburg, owners of Something Sweet LLC after they submitted an inquiry on Nick-N-Willy's web site about setting up their own Nick-N-Willy's pizza business. He invited them to attend an open house, where a Nick-N-Willy's executive encouraged them to work with Moore to pursue a store franchise. Moore provided the Brandenburgs with Nick-N-Willy's uniform franchise offer-

---

[1] Although Moore alone signed the agreement, his mother, Patti Moore, acted as his business partner.

ing circular and proposed franchise agreement in May 2006. The franchise agreement did not require franchisees to specify which model they would follow, and it provided that Nick-N-Willy's could change store operating methods in the future. Moore introduced the Brandenburgs to a retail space broker who helped them negotiate a lease at the Snoqualmie Ridge mall. Because there was already a pizza business in the mall, the lease prohibited them from providing cooked pizzas. The Brandenburgs agreed to this term because they wanted to operate an outlet store, which would sell only take-and-bake pizzas. Nick-N-Willy's granted a store franchise to Something Sweet effective September 6, 2006.[2]

¶5 In August 2008, the Brandenburgs sued Nick-N-Willy's and the Moores for rescission and damages under the Franchise Investment Protection Act (FIPA). They alleged Nick-N-Willy's failed to disclose that it was planning to discontinue the outlet store model at the time they purchased the franchise. They also claimed the Moores were subfranchisors and violated the act by failing to register a franchise offering. Nick-N-Willy's and the Moores moved for summary judgment, arguing that Nick-N-Willy's did not abandon its take-and-bake only stores, the Moores were not subfranchisors, and the Moores were not required to register. The superior court dismissed the Brandenburgs' claims and denied their motion for reconsideration. They sought direct review in our Supreme Court, which transferred the case to this court.

---

[2] Shortly after this, Nick-N-Willy's chief executive officer, Richard Weil, sent a letter to the Brandenburgs expressing concern about their proposed site. The letter stated, "The Franchisor would not normally approve this Proposed Site due to the following concerns: competitive landscape, the prohibition on any cooked pizza and the overall location within the shopping center. However, given your strong desire to build a store in this Proposed Site and your personal belief in the success of this location, the Franchisor is willing to permit the lease process to proceed . . . ."

## ANALYSIS

### Material Omission

■ ■ ¶6 The Brandenburgs argue that the trial court improperly dismissed their material omission claim on summary judgment because Nick-N-Willy's presented no evidence to disprove their allegation that it was planning to discontinue the outlet model at the time they purchased their franchise. This court reviews a summary judgment order de novo, engaging in the same inquiry as the trial court. *Simpson Tacoma Kraft Co. v. Dep't of Ecology*, 119 Wn.2d 640, 646, 835 P.2d 1030 (1992). Summary judgment is proper when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c); *Huff v. Budbill*, 141 Wn.2d 1, 7, 1 P.3d 1138 (2000). The court must construe facts and reasonable inferences from those facts in the light most favorable to the nonmoving party. *Michak v. Transnation Title Ins. Co.*, 148 Wn.2d 788, 795, 64 P.3d 22 (2003). However, the nonmoving party may not rely on mere allegations, denials, opinions, or conclusory statements, but must set forth specific facts to show there is a genuine issue for trial. *Int'l Ultimate, Inc. v. St. Paul Fire & Marine Ins. Co.*, 122 Wn. App. 736, 744, 87 P.3d 774 (2004).

■ ¶7 The legislature enacted FIPA to curtail franchisor sales abuses and unfair competitive practices. *E. Wind Express, Inc. v. Airborne Freight Corp.*, 95 Wn. App. 98, 102, 974 P.2d 369 (1999). To prevent these practices, FIPA generally requires franchise offers to be registered with the state and material information be disclosed to prospective franchisees. *Corp v. Atl.-Richfield Co.*, 122 Wn.2d 574, 579-80, 860 P.2d 1015 (1993). The information disclosed must be accurate and cannot omit material facts.

> It is unlawful for any person in connection with the offer, sale, or purchase of any franchise or subfranchise in this state directly or indirectly:
>
> . . . .

(2) To sell or offer to sell by means of any written or oral communication which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements made in light of the circumstances under which they were made not misleading.

RCW 19.100.170.

██ ¶8 In *Morris v. International Yogurt Co.*, 107 Wn.2d 314, 729 P.2d 33 (1986), our Supreme Court addressed when a fact would be considered material under FIPA. It noted that the language in RCW 19.100.170(2) is essentially the same as the antifraud language in The Securities Act of Washington, RCW 21.20.010(2). *Morris*, 107 Wn.2d at 322-23. Based on cases interpreting that provision, the court held that a fact would qualify as material under FIPA if a reasonable person would consider it important in determining what action to take with respect to the transaction in question. *Morris*, 107 Wn.2d at 323. In *Morris*, the franchisor failed to disclose that its unique yogurt mix was available to nonfranchisees. *Morris*, 107 Wn.2d at 316. To determine whether a reasonable person would consider this fact important, the court looked to the franchise agreement, which repeatedly emphasized that by purchasing the franchise, the franchisee would acquire the right to purchase the unique yogurt mix. *Morris*, 107 Wn.2d at 324. The court noted that the franchise agreement described the yogurt mix as a trade secret and concluded, "[T]he agreement clearly indicates that the right to purchase this one-of-a-kind yogurt mix is a key feature of the franchise." *Morris*, 107 Wn.2d at 324. Because the availability of the yogurt mix to nonfranchisees would make the franchise far less valuable, the court determined that it was a material fact, which should have been disclosed. *Morris*, 107 Wn.2d at 326-27.

██ ¶9 Here, the Brandenburgs allege that Nick-N-Willy's was planning to discontinue its outlet franchises at the time they purchased their franchise and that its failure to disclose this fact was a material omission. But Nick-N-Willy's presented evidence in support of its summary judgment motion

to show it had not discontinued its outlet stores. It offered an affidavit from its chief executive officer stating that it continues to support outlet stores throughout the country, including locations in Boise, Idaho; Brookfield, Oconomowoc, and Kenosha, Wisconsin; Woodland, Texas; Rapid City, South Dakota; Peoria, Illinois; Arvada, Louisville, Boulder, and Highlands Ranch, Colorado; and North Mankato, Minnesota. In response, the Brandenburgs pointed to evidence that approximately seven months after they purchased their franchise, Nick-N-Willy's announced a plan to require new franchises to offer some dining facilities. But under this plan, existing outlet stores were not required to change their operations and they continued to receive support from Nick-N-Willy's. The Brandenburgs failed to offer any evidence beyond mere allegations that this prospective policy affected existing outlet stores such as theirs.[3] At most, the Brandenburgs' evidence suggests that Nick-N-Willy's was considering a shift in its mix of stores going forward that would result in a larger proportion of stores following the restaurant model.

¶10 The Brandenburgs claim the materiality of such a plan would be "self-evident" to any prospective franchise purchaser. Br. of Appellants at 2. But it is undisputed that Nick-N-Willy's disclosed to the Brandenburgs in May 2006 through its offering circular and the franchise agreement that such a shift might occur if Nick-N-Willy's decided to change its store operating methods in the future. This situation differs substantially from *Morris*, where the ability to purchase the unique yogurt mix was a key feature of the franchise agreement. Here, the nationwide mixture of

---

[3] The Brandenburgs claim that Nick-N-Willy's no longer provides meaningful marketing for take-and-bake only stores, but it fails to support this conclusory assertion with evidence in the record. In contrast, Nick-N-Willy's provided evidence that all Nick-N-Willy's stores—restaurant and outlet—continue to offer take-and-bake pizzas and that they remain an integral part of its business. Additionally, the Moores presented evidence that Nick-N-Willy's promoted both its unbaked and baked products throughout their experience with the company. Finally, while the Brandenburgs claim Nick-N-Willy's touted its outlet model when they decided to purchase a franchise, the only evidence they cite is an article from Pizza Marketing Quarterly featuring a Nick-N-Willy's store following the *restaurant* model.

outlet and restaurant models was not a key feature of the franchise agreement. Indeed, the number of outlet versus restaurant stores was not mentioned in the franchise agreement. And the agreement did not require franchisees to specify which model they would follow or limit their ability to change methods based on local conditions, so there would have been no reason to expect the mixture of stores to remain static. Under these circumstances, even assuming Nick-N-Willy's was considering a change to the way new stores might operate in the future, the Brandenburgs failed to show that disclosure of this fact would have been necessary to make the franchise offering not misleading. Because the Brandenburgs failed to demonstrate a genuine factual dispute whether the franchise offer omitted a material fact, the trial court properly dismissed this claim on summary judgment.

*Registration*

¶11 The Brandenburgs also argue that the Moores were subfranchisors as defined by FIPA and, as such, they were required to register a franchise offering with the state. The Moores argue that they were not subfranchisors and that even if they were, FIPA did not require them to register because Nick-N-Willy's had already registered its franchise offering. Because we agree with the Moores that FIPA does not require dual registration by franchisors and subfranchisors, we do not reach the issue of whether the Moores were subfranchisors.

¶12 Statutory interpretation is a question of law, reviewed de novo. *Thompson v. Hanson*, 168 Wn.2d 738, 744, 239 P.3d 537 (2009). When interpreting a statute, the court first looks to its plain language. *State v. Armendariz*, 160 Wn.2d 106, 110, 156 P.3d 201 (2007). "If a statute is clear on its face, its meaning is to be derived from the language of the statute alone." *Kilian v. Atkinson*, 147 Wn.2d 16, 20, 50 P.3d 638 (2002).

¶13 FIPA provides, "It is unlawful for any franchisor or subfranchisor to sell or offer to sell any franchise in this

state unless the offer of the franchise has been registered under this chapter or exempted under RCW 19.100.030."[4] RCW 19.100.020(1). An application for registration must be filed with the director of financial institutions and be signed by "the franchisor, subfranchisor, or by any person on whose behalf the offering is to be made . . . ." RCW 19.100.040(1). When the person filing the registration application is a subfranchisor, the application must include the same information as required of the franchisor. RCW 19.100.040(2). The registration application must include a copy of the franchisor's or subfranchisor's offering circular, a copy of all agreements to be proposed to franchisees, a consent to service of process, and any other information the director deems necessary. RCW 19.100.040(1). A person must deliver a copy of the offering circular and any proposed franchise agreements to the prospective franchisee at least 10 business days before selling the franchise. RCW 19.100.080.

¶14 Here, it is undisputed that Nick-N-Willy's properly registered its franchise offering according to FIPA's requirements and that a copy of its offering circular and proposed franchise agreement were delivered to the Brandenburgs more than 10 business days before they purchased the franchise.[5] The Brandenburgs contend this was insufficient because the Moores should have separately registered the offer as well. They point out that under RCW 19.100.040(2), subfranchisors are required to provide the same information as franchisors. But this provision only applies "[w]hen the person filing the application for registration is a subfranchisor . . . ." RCW 19.100.040(2). Here, the Moores did not file the application for registration. Rather, the registration application was made on behalf of Nick-N-Willy's. The only franchise offered to the Brandenburgs was the Nick-N-Willy's store franchise. And the Moores were not a party to

---

[4] Neither party contends any of the exemptions listed in RCW 19.100.030 apply here.

[5] The record indicates the Brandenburgs received these documents several months before they purchased the Nick-N-Willy's store franchise and they used that time to obtain independent legal advice before signing the franchise agreement.

the franchise agreement between Nick-N-Willy's and the Brandenburgs. The Brandenburgs point to nothing in FIPA that would require the Moores to apply for registration of the Nick-N-Willy's franchise offering given that Nick-N-Willy's had already done so.[6] Based on its plain language, RCW 19.100.020 does not prohibit a subfranchisor from selling or offering to sell a franchise if the offer of the franchise has already been properly registered. *See* RCW 19.100.020(1) ("It is unlawful for any franchisor or subfranchisor to sell or offer to sell any franchise in this state *unless the offer of the franchise has been registered under this chapter . . . .*" (emphasis added)). The Moores, regardless of whether they qualified as subfranchisors, did not violate FIPA's registration requirement because the Nick-N-Willy's franchise offered to the Brandenburgs was already registered.

¶15 Consequently, we affirm the trial court's summary judgment dismissal of the Brandenburgs' claims.

DWYER, C.J., and ELLINGTON, J., concur.

Review denied at 170 Wn.2d 1021 (2011).

---

[6] The Brandenburgs do cite a 1991 interpretative statement by the director of financial institutions that appears to support their dual registration argument. But this statement was issued before major revisions to FIPA later that year. *See* S.B. 5256, 52nd Leg., Reg. Sess. (Wash. 1991). In any event, we adhere to the plain language of a statute over an agency's interpretative statements. *See Cerrillo v. Esparza*, 158 Wn.2d 194, 201-02, 142 P.3d 155 (2006) (where a statute is unambiguous, it is error to rely instead on the interpretative opinions of an administrative agency).