[No. 59192-0. En Banc. December 17, 1992.]

SCOTT NELSON, ET AL, *Respondents*, v. NATIONAL FUND RAISING CONSULTANTS, INC., ET AL, *Petitioners*.

*Edwards, Sieh, Wiggins & Hathaway,* by *Charles K. Wiggins* and *John W. Hathaway,* for petitioners.

*Gary M. Abolofia,* for respondents.

UTTER, J. — Maurice DeShazer and National Fund Raising Consultants, Inc. (hereafter DeShazer) assign error to a Washington State Court of Appeals decision affirming a trial court judgment that DeShazer violated the Franchise Investment Protection Act, RCW 19.100, in his dealings with Scott and Katherine Nelson. DeShazer contends he did not violate the Franchise Investment Protection Act or the Consumer Protection Act, RCW 19.86. We hold that DeShazer violated the Franchise Investment Protection Act, and affirm the trial court.

DeShazer is the president of National Fund Raising Consultants, Inc. (NFRCI), a Colorado corporation which solicits and organizes fund-raising activities for churches, schools, and the like. The firm operates in 19 states and features a

fund-raising method called a "pizza make". A school or club takes orders for a selected variety of pizzas. When the orders are completed, the group gathers and makes the pizzas under the supervision of, and with supplies provided by, NFRCI. The pizzas are then delivered to the customers and the money is collected. The nonprofit group retains a portion of the receipts and the remainder goes to NFRCI.

In 1985, Scott and Katherine Nelson responded to a "business opportunity" advertisement placed by DeShazer in a Washington newspaper. DeShazer told the Nelsons that they could be "area directors" for NFRCI at a cost of $18,000. The Nelsons could not afford this investment, so DeShazer offered them an opportunity to work directly for NFRCI as commissioned salespeople or "area managers". On commission, the Nelsons organized pizza makes and were paid $1 for each pizza sold. They later decided to become area directors. As directors, they would receive an exclusive territory, hire their own salespeople, pay a fee to NFRCI, and retain the profits. The Nelsons paid DeShazer $15,000 to become directors, and signed a "Total Requirements Agreement" (Agreement) on October 1, 1985. The Agreement did not specify that the NFRCI would retain any moneys. Total Requirements Agreement; Report of Proceedings, at 172.

Under the Agreement, in exchange for an exclusive territory, the Nelsons were required to obtain their supplies through NFRCI. A corporation was created for the Nelsons' business and was transferred into their control. The Nelsons also agreed to pay an unspecified "standard" markup on all supplies received through NFRCI. Report of Proceedings, at 474. Food supplies were ordered locally by the Nelsons. The supplier then sent the bill to NFRCI in Colorado, which added its markup to the bill, and sent it to the Nelsons. When the Nelsons received their first bill, they were able to determine the markup was 20 percent. The parties have consistently referred to this markup as a "royalty".

The Nelsons were very successful with their business and expanded into Canada in 1987. In 1988 they sold over 225,000 pizzas. Problems arose between the parties, however. In 1988,

DeShazer learned that his "area directorships" were probably franchises and would have to be registered with the State. He did so and presented the Nelsons a franchise contract. The Nelsons refused, and protracted negotiations ensued. In February 1989, the Nelsons told DeShazer that they would no longer pay him a fee. Disputes then arose as to which party had the right to operate in Washington.

In December 1989, the Nelsons initiated this lawsuit; DeShazer counterclaimed and both parties moved for injunctive relief. The Superior Court for King County ruled the Agreement was a franchise agreement and the food markup violates RCW 19.100.180(2)(d), which prohibits franchisors from selling goods to franchisees for more than "a fair and reasonable price." Injunctive relief between the parties was fashioned by the court. The court specifically noted that it had not made a final ruling as to damages or attorney fees, but said its injunctive relief was final, and ordered the judgment entered. The parties cross-appealed.

Division One of the Washington State Court of Appeals reached two issues, only one of which is relevant here: Whether the percentage markup on the cost of materials violated the Franchise Investment Protection Act (the Franchise Act or Act). *Nelson v. National Fund Raising Consultants, Inc.*, 64 Wn. App. 184, 191, 823 P.2d 1165 (1992). The trial court was affirmed on this issue by the Court of Appeals. It reasoned that to accept DeShazer's arguments would require reading the pertinent provisions of the Act in a way that vitiates the Act's essential purpose.

I

FRANCHISE ACT VIOLATION

Both the trial court and Court of Appeals concluded that DeShazer violated RCW 19.100.180(2)(d).[1] That section reads in part:

---

[1]The trial court's comments in its oral ruling also indicated that it regarded the method used as an unlawful tying arrangement in violation of RCW 19-.100.180(2)(b). That section states in pertinent part that a franchisor may not:

*Require a franchisee to purchase* or lease goods or services of the franchisor or from approved sources of supply *unless and to the extent that the franchisor*

For the purposes of this chapter and without limiting its general application, it shall be an unfair or deceptive act or practice or an unfair method of competition and therefore unlawful and a violation of this chapter for any person to: . . . .

(d) *Sell*, rent, or offer to sell to a franchisee *any product or service for more than a fair and reasonable price.*

(Italics ours.)

DeShazer's principal argument is the markup he imposed on the goods the Nelsons purchased did not violate this provision because the markup was actually a "franchise fee" or royalty. He claims it was thus not an unfair or unreasonable price imposed on goods and services. Stated differently, DeShazer urges us to think of the "price" of goods as comprising two discrete components: the actual food price and the markup or franchise royalty.

■ DeShazer supports his position by emphasizing two provisions of the Franchise Act. First, he argues the definition of "franchise fee" in the Act is so broad as to include markups on goods and services.[2] That position is unpersua-

---

*satisfies the burden of proving that such restrictive purchasing agreements are reasonably necessary for a lawful purpose justified on business grounds, and do not substantially affect competition . . ..*
(Italics ours.)

As the Court of Appeals noted, because the trial court found the arrangement violated RCW 19.100.180(2)(d), it did not address the issue whether the method also violated subsection .180(2)(b).

[2] The Act defines "Franchise fee" as: "any fee or charge that a franchisee or subfranchisor is required to pay or agrees to pay for the right to enter into a business or to continue a business under a franchise agreement, including, but not limited to, the payment . . . of . . . any fee or charges based upon a percentage of gross or net sales whether or not referred to as royalty fees, any payment for [the mandatory purchase of] goods or services [or any payment for goods or services available only from the franchisor], or any training fees or training school fees or charges; *however, the following shall not be considered payment of a franchise fee*: (a) *the purchase or agreement to purchase goods at a bona fide wholesale price*; (b) the purchase or agreement to purchase goods by consignment; if, and only if the proceeds remitted by the franchisee from any such sale shall reflect only the bona fide wholesale price of such goods; . . . (d) *the purchase or agreement to purchase goods at a bona fide retail price subject to a bona fide commission or compensation plan that in substance reflects only a bona fide wholesale transaction*; (e) the purchase [or lease] or agreement to purchase [or lease] supplies or fixtures necessary to enter into the business or to

sive for two reasons. First, the Act *excepts* from its definition of permissible franchise fees any "purchase or agreement to purchase goods at a bona fide wholesale price".[3] That exception applies precisely to the type of agreement at issue here. DeShazer can avoid the exception only by a highly strained reading of the provision, whereby an agreement, by virtue of charging more than the wholesale price, ceases to be an agreement to purchase "wholesale" goods. We find no support for the argument the Legislature intended to indulge such reasoning. Second, to read the definition of franchise fee to encompass surcharges on wholesale prices would permit franchisors to circumvent the provision of the Act prohibiting the imposition of charges above a fair and reasonable price. Indeed, if DeShazer's argument were to prevail, any price — even an unfair or unreasonable one — could be rendered proper by characterizing it as a franchise fee or royalty arrangement.

The second provision on which DeShazer relies is RCW 19.100.180(2)(e). That provision states that it is an unfair practice for a franchisor to "[o]btain money, goods, services,

---

continue the business under the franchise agreement at their fair market [or rental] value; . . .." (Italics ours.) Former RCW 19.100.010(11).

The sections in brackets, above, did not appear in the initial version of the Act. *Compare* Laws of 1971, 1st Ex. Sess., ch. 252, § 1, *with* Laws of 1972, 1st Ex. Sess., ch. 116, § 1. Subsection (11) of the statute is now subsection (12). Laws of 1991, ch. 226, § 1.

[3]A statement in *Corp v. ARCO*, 45 Wn. App. 563, 567, 726 P.2d 66 (1986), *review denied*, 108 Wn.2d 1014 (1987), read out of context, might create a misimpression about the propriety of imposing fees on goods and services under the statute. There, the court stated: "The statutory definition suggests that a franchise fee 'includes "fees hidden in the franchisor's charges for goods or services." ' " (Citations omitted.) *ARCO* is not relevant to the case at bar because (1) it concerned a different provision of the Act (the purchase or lease of real property under former RCW 19.100.010(11)(f)); and (2) the issue in *ARCO* was whether imposition of a fee in a business arrangement indicated the existence of a franchise, not whether the fee was permissibly imposed under the Act. In other words, the question whether a charge is a "fee" for the purpose of determining whether the Franchise Act applies (the question in *ARCO*) is distinct from the question whether the fee is proper or improper under the Act (the question here).

anything of value, or any other benefit from any other person with whom the franchisee does business on account of such business *unless such benefit is disclosed* to the franchisee." (Italics ours.) DeShazer argues that, because a franchisor may receive a benefit from suppliers if it is disclosed, his markup is permissible under the Act because he disclosed it to the Nelsons.

One commentator, Professor Donald Chisum, has noted the apparent conflict between this section and the fair and reasonable price provision. *See* Chisum, *State Regulation of Franchising: The Washington Experience*, 48 Wash. L. Rev. 291, 372-73 (1972-1973). As Chisum observes, if the franchisor may control the source of supply for a franchisee, the franchisor may require the franchisee to purchase supplies through the franchisor or from approved sources. If the franchisor sells the goods, it can charge only a reasonable price under RCW 19.100.180(2)(d). On the other hand, if the franchisee is forced to buy from approved sources, the supplier may charge an unreasonably higher price and split the profits with the franchisor as long as the arrangement is disclosed under RCW 19.100.180(2)(e). Chisum concludes that the two sections should ideally follow consistently either the disclosure theory or the prohibitory theory. Chisum, 48 Wash. L. Rev. at 373. We follow the prohibitory theory in this case because it better comports with the general purpose of the Act, to protect franchisees, and because to do otherwise would vitiate the provision of the Act forbidding franchisors from imposing unfair or unreasonable prices on the costs of goods and services. *See* RCW 19.100.180(2)(d).

Although there is some technical merit to DeShazer's contention that it is anomalous to invalidate the markup when he could have generated the same profit using some other method of charging, we cannot agree with his arguments for three reasons.

First, DeShazer's argument about the timing of the Nelsons' knowledge is not clearly supported by the record. DeShazer relies on the trial court's finding of fact 63 that the Nelsons knew all the material terms of the operation before

becoming area directors. Clerk's Papers, at 207. However nothing in the Total Requirements Agreement, dated October 1, 1985, indicated that the price of the goods would include a markup. The Nelsons appear to have learned the precise percentage the markup represented, when they received their first bill. The court's finding of fact 24 states:

> Under the terms of the Total Requirements Agreement, the plaintiffs were required to purchase all product [*sic*] and equipment from NFRCI. There is no statement in the contract of the price for said purchases. In practice, NFRCI required that the Nelsons and other area directors order their pizza ingredients and supplies from a local distributor which made direct deliveries to the area director. The distributor, however, would bill NFRCI and/or DeShazer for the product. NFRCI and DeShazer would then mark up or "boost" the wholesale price of the product by twenty percent (20%) and require that the area director pay this higher amount.

Clerk's Papers, at 195. Moreover, the trial record contains the undisputed testimony of Scott Nelson that he was able to ascertain the percentage the markup represented only upon receipt of his first bill. See Report of Proceedings, at 465.[4] See also, trial court's comment suggesting the Nelsons did not know the markup was 20 percent at the time they signed the contract. Report of Proceedings, at 570. The trial court's finding of fact 63, viewed against this record, per-

---

[4] Scott Nelson testified:

"Q: At the time, you were excited to become an area director?

"A: Yes.

"Q: And Maurice explained about the 20 percent override before that?

"A: No.

"Q: What did he say?

"A: He simply said there was an override. He never gave a dollar amount. In fact, the first time that we saw that was the first bill that we paid as area directors, and we backtracked and figured it was 20 percent. Maurice [DeShazer] never, never specified what it was. Bottom line was, we probably were ignorant at the time. We trusted Maurice with just about everything. Like I said before, he came to our house. We trusted him and we took his word for things. I asked him specifically if I should go to a lawyer, and he basically said, no, there's no reason for this." Report of Proceedings, at 465.

suades us the trial court meant by its finding only that the Nelsons understood the material facts about the operation of the business, not that they were aware there would be a 20 percent markup on the goods they purchased before becoming directors. Clerk's Papers, at 207. Disclosure of a contract's terms, to be meaningful, must occur before contract formation, not after the parties have become contractually bound. *See generally* Restatement (Second) of Contracts, ch. 3 (1981). Because disclosure, at least as to the precise content of the markup, occurred only after the contract was formed, DeShazer cannot rely on disclosure to insulate himself from the charge of violating the Act.

Second, the argument that the same profit could have been generated some other way is not persuasive. One of the purposes of the statute is precisely to structure agreements between franchisor and franchisee so as to maximize disclosure and thus minimize franchisor overreaching. *See* Chisum, 48 Wash. L. Rev. at 358-59 ("One of the primary purposes of the Franchise Act is to curb franchise sales abuses by requiring full and accurate disclosure of material information to the prospective franchisee." *See also Morris v. International Yogurt Co.*, 107 Wn.2d 314, 317, 729 P.2d 33 (1986)). The Washington State Court of Appeals has explained:

> Franchising has disadvantages for franchisees . . . who suffer a lack of material information before purchasing their franchise and of bargaining power after purchasing. Chisum, at 297. *See generally* C. Rosenfield, *Franchising*, ch. 1 (1970) (history of franchising and its regulation). The State Legislature enacted FIPA in 1972 in order to correct this maldistribution of information and power. Chisum.

*Lobdell v. Sugar 'N Spice, Inc.*, 33 Wn. App. 881, 888, 658 P.2d 1267, *review denied*, 99 Wn.2d 1016 (1983).

Third, DeShazer's interpretations of former RCW 19.100-.010(11) and RCW 19.100.180(2)(d) are unavailing because they construe these provisions in a way that renders them incompatible with the other provisions of the Act, and with

the Act's fundamental purpose. Thus, reading the definition of "franchise fee" in former RCW 19.100.010(11) expansively would render meaningless the Legislature's express exception from its definition agreements to purchase goods at a bona fide wholesale price. Likewise, construing the disclosure provisions broadly would effectively nullify the prohibition in RCW 19.100.180(2)(d) against charging more than a fair and reasonable price for goods and services. Statutory provisions are construed in light of one another and in view of the statute's overall purpose. *See, e.g., Prince v. Savage*, 29 Wn. App. 201, 627 P.2d 996, *review denied*, 96 Wn.2d 1002 (1981).

For the reasons set forth above, we affirm the trial court's conclusion that DeShazer violated the Franchise Act.

## II
### CONSUMER PROTECTION ACT VIOLATION

DeShazer contends also that because the Nelsons knew about the markup, it could not qualify as a deceptive practice under the Consumer Protection Act (CPA). We disagree.

■ First, as discussed above, the disclosure was insufficient, as it occurred after the agreement was signed. Second, DeShazer misconstrues relevant case law to require actual deception in order to establish a violation of the CPA. The necessary showing is that a given act or practice has a *capacity* to deceive. *See Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wn.2d 778, 785, 719 P.2d 531 (1986).

Second, a capacity to deceive exists on the undisputed facts of this case: Knowledge of the percentage the markup represented was made available to the Nelsons only after they had become contractually bound. Moreover, although the legislative history is silent, the prohibition on charging more than a fair and reasonable price for products and services may reflect legislative concern that inflating these costs is a potential area of franchisor overreaching. *See generally* Chisum, *State Regulation of Franchising: The Wash-*

*ington Experience*, 48 Wash. L. Rev. 291, 358 (1972-1973); *see also Lobdell*, at 888. As such, the practice can be deemed inherently to possess the capacity to deceive.

For the foregoing reasons we affirm the trial court. The trial court's holding with respect to the Consumer Protection Act, however, is overbroad. The trial court stated:

> The practice by NFRCI and DeShazers of marking up the wholesale price of products and supplies to NFRC/Washington and to plaintiffs Nelson by a percentage of food costs and requiring the plaintiffs, Nelson and NFRC/Washington, to purchase all products and supplies from NFRCI was a violation of the Washington Franchise Investment [Protection] Act, RCW 19.100.180(2)([d]), and was an unfair and deceptive business practice *and in violation of RCW 19.86* (the Consumer Protection Act).

(Italics ours.) Clerk's Papers, at 209-10.

■ Violation of the Franchise Act does not automatically establish a violation of the Consumer Protection Act. The Legislature has provided violations of the Franchise Investment Protection Act are per se unfair trade practices under the Consumer Protection Act. RCW 19.100.190(1) provides:

> The commission of any unfair or deceptive acts or practices or unfair methods of competition prohibited by RCW 19.100-.180 as now or hereafter amended *shall constitute an unfair or deceptive act or practice* under the provisions of chapter 19.86 RCW [CPA].

(Italics ours.) To establish a Consumer Protection Act violation, the following elements must be shown: (1) an unfair or deceptive act or practice; (2) in trade or commerce; (3) which affects the public interest; (4) injuring the plaintiff in plaintiff's business or property; and (5) causing the injury suffered. *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wn.2d 778, 784-85, 719 P.2d 531 (1986).

The trial court's findings of fact do not permit the conclusion that all five elements were met. It is possible that the trial court intended to address these elements if and when the case was remanded for a determination of damages. On remand, the trial court is to make its findings and conclusions consistent with *Hangman Ridge*.

The decision of the trial court is affirmed and the case remanded for determination of the remaining issues.

DORE, C.J., and BRACHTENBACH, ANDERSEN, DURHAM, SMITH, GUY, and JOHNSON, JJ., concur.