[No. 59901-7.   En Banc.   October 21, 1993.]

CRAIG D. CORP, ET AL, *Plaintiffs*, BOB VERNON, ET AL, *Respondents*, v. ATLANTIC-RICHFIELD COMPANY, *Petitioner*.

*Graham & Dunn,* by *Douglas C. Berry* and *Peter S. McCormick,* for petitioner.

*Lopez & Fantel* and *Carl A. Taylor Lopez,* for respondents.

MADSEN, J. — We granted review of a published Court of Appeals decision remanding this case for a factual determination of whether changes made in a franchise agreement constituted a nonrenewal or termination of the agreement under Washington's Franchise Investment Protection Act (FIPA), RCW 19.100. We reverse and affirm the judgment of the trial court that, as a matter of law, the changes did not constitute nonrenewal or termination of the franchise agreement under Washington law.

## FACTS

In the early 1970's, Atlantic Richfield Company (ARCO) began a minimarket program combining gasoline sales with convenience grocery stores. Between 1976 and 1979, all of the plaintiffs in this case (hereafter referred to as the franchisees) entered the minimarket program by executing 3-year service station leases and addenda authorizing the sale of convenience store products. The agreements provided for payment of a royalty based on a percentage of the gross sales of grocery store items. The standard fee was 10 percent, though some smaller stores were charged 8 percent for a short period of time. Each lease stated that ARCO made no commitment regarding renewal beyond the term of the lease, and that a substantially different form of business relationship might be offered upon expiration of the lease.

After some success with the minimarket program, ARCO decided to modify it to better compete with others in the convenience store industry. ARCO designed the "am/pm" program to create a protectible identity that could be aggressively promoted. The am/pm franchise was registered in Washington in December 1979. Like the minimarket leases, the am/pm program involved the operation of convenience stores on 3-year contracts. Unlike the minimarket leases, however, the am/pm franchise required ARCO to provide training, advertising, and merchandising services; imposed uniform standards of operation; and included the licensing of ARCO's registered am/pm service marks. The am/pm program also required payment of a $10,000 franchise fee and a 1 percent advertising fee. The am/pm franchise further required payment of a 14 percent royalty for stores open 16 hours a day and an 11 percent royalty for stores open 24 hours a day.

After registering the am/pm franchise, ARCO offered it to the franchisees herein. Each had 45 days to respond and, if the offer was accepted, ARCO agreed to waive the franchise fee. ARCO did not condition renewal of the minimarket leases on acceptance of the am/pm franchise.

Seven of the franchisees accepted the am/pm franchise offer. The four who did not were offered new 3-year minimarket leases as their existing leases expired. The new leases increased the royalty fee to 14 percent, reflecting a rate increase instituted by ARCO in 1979. According to ARCO, the fee change reflected the increased cost of operating the program, the amounts charged by competitors, and the effects of inflation on real estate values. ARCO stopped offering minimarket leases to new dealers.

The franchisees filed suit against ARCO in July 1980, alleging that in its effort to convert minimarkets to am/pm franchises, ARCO misinformed and failed to disclose material facts to prospective franchisees and used economic coercion in violation of FIPA and other laws. The franchisees sought declaratory and injunctive relief and damages for, among other

things, loss of business, payment of unfair fees, and loss of customer identification.

Prior to trial, the parties filed cross motions for partial summary judgment on the issue of whether the minimarket leases were "franchises" within the meaning of FIPA. The trial court's ruling that the leases were franchises was affirmed. *Corp v. ARCO*, 45 Wn. App. 563, 569-70, 726 P.2d 66 (1986), *review denied*, 108 Wn.2d 1014 (1987). On remand, the parties entered into a stipulation and pretrial order limiting the franchisees' claims to the following: (1) ARCO terminated the minimarket leases of those who entered into am/pm franchises, in violation of RCW 19.100.180(2)(j); (2) ARCO misrepresented to those who entered into am/pm franchises that it would terminate or not renew their minimarket leases if they declined to accept the franchises, in violation of RCW 19.100.170(2); and (3) ARCO constructively terminated or refused to renew the minimarket leases of those who declined to accept am/pm franchises by deliberately failing to perform its obligations under the leases, in violation of RCW 19.100-.180(2)(i) and (j).

ARCO moved for summary judgment on claims (1) and (3), contending that it had neither terminated nor refused to renew the minimarket leases as a matter of law because the franchisees continued to hold the right to use ARCO's trademark as minimarket dealers or am/pm franchisees. In opposition, the franchisees argued that issues of fact remained as to whether the minimarket leases were terminated or non-renewed because the terms of the new minimarket leases were financially unreasonable and because the new terms constituted a breach of several oral promises allegedly made by ARCO early in the minimarket program. According to franchisee Richard Dawson, ARCO said it (1) would never increase royalty payments over 10 percent; (2) would make the minimarkets a national chain; (3) would aggressively support the minimarkets; and (4) would provide dealer representatives trained in the convenience store business. ARCO moved to strike Dawson's affidavit.

The trial court granted ARCO's motion for summary judgment, concluding that, as a matter of law, ARCO did not terminate or refuse to renew its minimarket leases with the franchisees. The court did not rule on the motion to strike. ARCO then moved for summary judgment on the remaining claim. The trial court granted the motion, concluding that ARCO was not required by law to renew the leases. The franchisees subsequently filed a motion to amend their pleadings to add six more claims, including one charging ARCO with violation of the duty of good faith under FIPA. The trial court denied the motion and directed the entry of judgment in favor of ARCO. Reconsideration was denied.

On appeal, all but one of the trial court's rulings were affirmed. The Court of Appeals reinstated the franchisees' claims for improper termination and nonrenewal of the original minimarket leases in *Corp v. ARCO*, 67 Wn. App. 520, 528-29, 837 P.2d 1030 (1992). The court held that the trier of fact must examine the proposed changes in a franchise offer and determine whether the new terms vary so substantially from those in the original franchise agreements and so diminish the franchisees' rights thereunder as to constitute new agreements, not renewals of existing agreements. Such new agreements would constitute a termination or nonrenewal of the existing franchise, thus triggering statutory compensation under FIPA. *Corp*, at 529. ARCO subsequently sought discretionary review of the Court of Appeals' decision, which this court granted.

At issue is whether a franchise offer that includes significant changes to an existing franchise agreement constitutes termination or nonrenewal of the existing agreement under Washington's Franchise Investment Protection Act, RCW 19.100. FIPA was enacted in 1971 to deal with sales abuses and unfair practices in the franchising of goods and services. *Morris v. International Yogurt Co.*, 107 Wn.2d 314, 317, 729 P.2d 33 (1986); *Rutter v. BX of Tri-Cities, Inc.*, 60 Wn. App. 743, 747, 806 P.2d 1266 (1991). FIPA is in two parts. The first regulates the offering and sale of franchises with detailed

requirements for registration of offers and disclosure of facts material to the transaction. *Coast to Coast Stores, Inc. v. Gruschus*, 100 Wn.2d 147, 150, 667 P.2d 619 (1983); *Lobdell v. Sugar 'N Spice, Inc.*, 33 Wn. App. 881, 888, 658 P.2d 1267, *review denied*, 99 Wn.2d 1016 (1983). The second part of FIPA responds to the problems of the franchisor-franchisee relationship with a "fair practices" or "franchisee bill of rights" section. RCW 19.100.180; *Coast*, at 150. The types of problems this "bill of rights" is intended to address have been described as follows:

> The franchisor normally occupies an overwhelmingly stronger bargaining position and drafts the franchise agreement so as to maximize his power to control the franchisee. Franchisors have used this power to terminate franchises arbitrarily, to coerce franchisees under threat of termination, and to force franchisees to purchase supplies from the franchisor or approved suppliers at unreasonable prices, to carry excessive inventories, to operate long, unprofitable hours, and to employ other unprofitable practices.

(Footnotes omitted.) Chisum, *State Regulation of Franchising: The Washington Experience*, 48 Wash. L. Rev. 291, 297-98 (1972-1973). It is RCW 19.100.180, the "bill of rights" intended to deal with such problems, that is of significance here.

RCW 19.100.180 states initially that "[t]he parties shall deal with each other in good faith." RCW 19.100.180(1). The statute then provides a long list of proscribed conduct. RCW 19.100.180(2) states that "it shall be an unfair or deceptive act or practice or an unfair method of competition and therefore unlawful and a violation of this chapter for any person to" perform the following 10 acts. One such act is to

> [r]efuse to renew a franchise without fairly compensating the franchisee for the fair market value, at the time of expiration of the franchise, of the franchisee's inventory, supplies, equipment, and furnishings purchased from the franchisor, and good will . . ..

RCW 19.100.180(2)(i). Compensation for goodwill is not required if the franchisor provides 1 year's notice of nonrenewal and agrees not to enforce any covenant not to compete. While the statute as originally worded granted fran-

chisees a right of renewal, this language was eliminated before the statute went into effect. *See* Laws of 1972, 1st Ex. Sess., ch. 116, p. 273.

Also prohibited under RCW 19.100.180 is termination of a franchise prior to the expiration of its term except for good cause. RCW 19.100.180(2)(j). Upon termination for good cause, "the franchisor shall purchase from the franchisee at a fair market value at the time of termination, the franchisee's inventory and supplies . . .." RCW 19.100.180(2)(j).

The franchisees here argued successfully to the Court of Appeals that ARCO engaged in an act of overreaching proscribed by FIPA by offering them new am/pm and minimarket agreements with terms more onerous than their original minimarket agreements. Despite the fact that none of the franchisees ceased doing business with ARCO as a result of these offers, the franchisees contended that the offer of new and financially unreasonable terms constituted a termination or nonrenewal of the original minimarket leases for which compensation was required under FIPA. The franchisees also argued, through the Dawson affidavit, that ARCO breached several oral promises made regarding the original minimarket program when it offered the new agreements, and that this breach constituted a termination requiring statutory compensation.

The Court of Appeals concluded that such changes and breaches *could* constitute nonrenewal or termination even though all of the franchisees herein accepted either the new minimarket agreement or the am/pm agreement. In so doing, the Court of Appeals rejected ARCO's contention that this court had found no cause of action for constructive termination under FIPA in *Coast*.

At issue in *Coast* was whether a franchise was terminated when the franchisee's business was suspended by the franchisor's repossession of its inventory. When the franchisor in *Coast* determined that the franchisee was in default, it demanded possession of the collateral. The store was double-locked to protect the collateral, after which the franchisor received a temporary restraining order freezing any dealing

with the inventory, equipment, and accounts receivable in the store. The franchisee then sought compensation for all inventory, supplies, furnishings, and goodwill pursuant to FIPA. The trial court ordered the franchisor to purchase all inventory and supplies pursuant to RCW 19.100.180(2)(j) because the franchise agreement was terminated when the store was double-locked. *Coast*, at 149.

This court reversed, holding that the trial court erred in equating cessation of the franchise business with termination of the franchise under RCW 19.100.180(2)(j). The court observed that under FIPA, the franchise is conceptually distinct from the franchisee's business. *Coast*, at 152. When *Coast* was decided, FIPA defined "franchise" as

> an oral or written contract or agreement, either expressed or implied, in which a person grants to another person, a license to use a trade name, service mark, trade mark, logotype or related characteristic in which there is a community interest in the business of offering, selling, distributing goods or services at wholesale or retail, leasing, or otherwise and in which the franchisee is required to pay, directly or indirectly, a franchise fee: . . . [.]

Former RCW 19.100.010(4). This definition applies here as well.[1]

■ This definition made it clear that the franchise was the agreement between the parties and not the business operated by the franchisee. *Coast*, at 152. Consequently, cessation of the franchisee's business operations would not necessarily constitute termination of the franchise. This court concluded from the "plain words" of FIPA that "a franchise is terminated only when the agreement between the franchisee and franchisor is brought to an end, terminating the franchisee's right to use the franchisor's trade name, service mark, or the like." *Coast*, at 153.

■ The Court of Appeals in this case distinguished *Coast* on the basis that it did not address the question of the point at which the terms of a purported franchise renewal so depart from the original franchise terms that a constructive

---

[1] The definition of a franchise was modified in 1991. Laws of 1991, ch. 226, § 1.

termination or nonrenewal has occurred. *Corp,* at 528. While this is true, we are persuaded that under *Coast* there was no termination of the franchises in this case. It is undisputed that all of the franchisees herein accepted ARCO's am/pm or new minimarket agreements and operated under ARCO's trade name without interruption. Moreover, one court has expressly held that *Coast* bars a cause of action for constructive termination under FIPA. *See Carlock v. Pillsbury Co.,* 719 F. Supp. 791, 852 (D. Minn. 1989).

One of the issues in *Carlock* was whether a franchisor's misrepresentations and failed promises constituted wrongful termination under FIPA even though the franchisees continued to hold and exercise their rights to use the Häagen-Dazs trademark and to market Häagen-Dazs products. The court in *Carlock* cited *Coast* and concluded that the franchisees could not recover under RCW 19.100.180(2)(j) for wrongful termination because their franchises had not actually been terminated. "Constructive termination of a franchise is not actionable under Wash.Rev.Code Ann. § 19.100-.180(2)(j)." *Carlock,* at 852. Thus, we interpret *Carlock,* as well as *Coast,* as supporting ARCO's contention that no termination occurred because the franchisees' right to use the ARCO name was never terminated.

■ The Court of Appeals in this case did not cite *Carlock* or a federal district court decision discussing nonrenewal under FIPA. *See Thompson v. ARCO,* 663 F. Supp. 206 (W.D. Wash. 1986). While the franchisees correctly argue that this court is not bound by federal court decisions, these opinions base holdings on FIPA and are helpful given the dearth of Washington law concerning franchise termination and nonrenewal.

Included among the plaintiffs in *Thompson* were two of the franchisees in the present case. They and other am/pm franchisees sought to bar ARCO from imposing a $20,000 franchise renewal fee. The franchisees claimed that ARCO violated FIPA by failing to disclose the amount of a future franchise fee in its initial franchise offer. *Thompson,* at 207. The court found initially that this argument was based in

part on the incorrect assumption that FIPA creates an automatic right to renew a franchise. Next, the court turned to the contention that any conditions to be placed upon the franchisee at any renewal of the am/pm franchises had to be disclosed in the first offering circular. The court rejected this argument as well:

> It defies logic to argue that Atlantic Richfield must disclose to its "am/pm" franchisees at the initial offering the unknown contract terms that will govern some future franchise agreement. . . .
> . . . [T]he competitive nature of the market place simply does not permit prudent businesses to fix for some indefinite period the prices of their products, especially in the retail oil and gasoline business.

*Thompson*, at 209-10. The court concluded that failure to disclose in an initial franchise offering circular the amount of a future franchise fee did not violate any provision of FIPA. *Thompson*, at 210.

Implicit in *Thompson* is the idea that renewal of a franchise agreement and new franchise terms are not mutually exclusive. The court made this conclusion explicit when it declined the franchisees' motion for reconsideration. *See Thompson v. ARCO*, Bus. Franchise Guide (CCH) ¶ 9080 (W.D. Wash. 1987).

In seeking reconsideration, the franchisees argued for the first time that ARCO actually had refused to renew their franchises with its new requirement of a $20,000 renewal fee. The court disagreed.

> ARCO has not refused to renew the franchises, nor have they been terminated. Plaintiffs simply are dissatisfied with some of the terms offered in the new agreement. Those terms were offered by ARCO on a non-discriminatory basis to all franchisees. A dislike of the terms of the new agreement strong enough to prompt plaintiffs not to seek renewal simply is not the same as a refusal to renew or a termination by ARCO.

*Thompson*, at 18,735.

The court reasoned that since ARCO never granted its franchisees a right to renew, the conditions and terms of renewal were not relevant to the initial franchise offer. ARCO had fully advised the franchisees that they had no absolute

right of renewal and that if ARCO offered them a new franchise, they would have to comply with ARCO's then-existing policy regarding franchises. "This disclosure fully comports with both the letter and spirit of the FIPA . . .." *Thompson*, at 18,736. Thus, the inclusion of new terms in a subsequent franchise offer comports with FIPA and does not constitute nonrenewal or termination of the original franchise.

Here, as in *Thompson*, ARCO granted no right to renew and told the minimarket dealers that subsequent agreements would contain the terms then being offered to other lessees. As in *Thompson*, the franchisees here were dissatisfied with some of the terms offered in the new am/pm and minimarket agreements. We agree with the *Thompson* court that a franchisee's dissatisfaction with new terms does not equal a refusal to renew or a termination by the franchisor.

The franchisees base their arguments to this court almost entirely on the premise that FIPA is designed to protect franchisees from franchisors.[2]

While this is true, that design cannot override the language of FIPA's termination, nonrenewal, and compensation provisions. Under RCW 19.100.180(2)(i) and (j), compensation is triggered by nonrenewal or termination of the franchise by the *franchisor*. The compensation provisions do not apply where a *franchisee* chooses not to enter into a franchise because of a dislike of its terms. Nor is compensation due where, as here, the franchisees continue to operate the franchised business. As this court pointed out in *Coast*, the franchisor is required by RCW 19.100.180(2)(j) to purchase the inventory following termination to protect the franchisee

---

[2]The franchisees claim that such protection must be implied, since it would be unreasonable to disallow compensation for termination or nonrenewal as long as the franchisor made *any* offer to renew. In the abstract, this result is possible if only the termination and nonrenewal provisions of FIPA are relied upon. However, the franchisees may have had a stronger challenge to an unreasonable renewal offer under RCW 19.100.180(1), which requires the parties to deal with each other in good faith. *See Nelson v. National Fund Raising Consultants, Inc.*, 120 Wn.2d 382, 842 P.2d 473 (1992). The franchisees sought to add a good faith claim to their complaint, but this argument was made too late and was dismissed by the trial court.

from being left without a franchise, but with a substantial investment in inventory which he or she cannot sell. *Coast*, at 154. We agree with ARCO that RCW 19.100.180(2)(i) and (j) do not require a franchisor to compensate franchisees for the value of the inventories they continued to sell, for the value of the equipment and supplies they continued to use, and for the "goodwill" they continued to enjoy as they operated their convenience stores.

The Fourth Circuit Court of Appeals reached a similar conclusion based on Maryland law in *Central GMC, Inc. v. General Motors Corp.*, 946 F.2d 327 (4th Cir. 1991), *cert. denied*, 112 S. Ct. 1265 (1992). When a dealer who sold light, medium, and heavy-duty trucks alleged that GMC's decision to discontinue making heavy-duty trucks constituted wrongful termination of his franchise, the circuit court disagreed. Under the language of the Maryland statute governing franchise terminations, the court found that GMC had discontinued a product, not terminated a franchise. *Central GMC*, at 332. The court declined the dealer's invitation to interpret the statute primarily in light of its overarching purpose of protecting vehicle dealers from the superior bargaining power possessed by vehicle manufacturers. The court found general purposes a less reliable guide to statutory interpretation than the specific language chosen by the legislature to implement those purposes, and also found that the general purpose of protecting dealers against abuses of superior bargaining power was not intended to insulate them from every adverse turn in a market economy. *Central GMC*, at 332. These findings apply here.

As the court in *Central GMC* noted, franchise protection does not guarantee a franchisee a risk-free endeavor. *Central GMC*, at 334. A franchise relationship is a business rather than a fiduciary relationship. Rau, *Implied Obligations in Franchising: Beyond Terminations*, 47 Bus. Law. 1053, 1075 (1992). Even under legislation providing franchisees with express protection from significant changes in franchise agreements, courts generally give considerable deference to franchisors' efforts to restructure, retrench, or

wind down their franchise systems. *See* Rau, 47 Bus. Law. at 1075-78.

One example of such legislation is the Wisconsin Fair Dealership Law. This law, which governs franchises and more traditional distribution arrangements, forbids a franchisor from terminating, canceling, failing to renew, or substantially changing the competitive circumstances of a dealership agreement without good cause. *See* ABA Antitrust Section: Monograph 17, *Franchise Protection: Laws Against Termination and the Establishment of Additional Franchises* ch. 2, at 17 (1990); *Remus v. Amoco Oil Co.*, 794 F.2d 1238, 1240 (7th Cir.), *cert. dismissed*, 479 U.S. 925 (1986). The Seventh Circuit explained in *Remus* that the provision forbidding substantial change is intended to protect the dealer from constructive termination, which the court defined as

> the franchisor's making the dealer's competitive circumstances so desperate that the dealer "voluntarily" gives up the franchise. . . . The Wisconsin Fair Dealership Law makes the equation explicit. Not only may the franchisor not terminate or fail to renew the franchise outright; the franchisor may not drive the dealer out of business . . ..

(Citation omitted.) *Remus*, at 1240. The court concluded, however, that this equation does not insulate a franchisee from changes in its franchise agreement. Specifically, the court held that Amoco's forcing of a "discount for cash" program on its franchisees was not a constructive termination of the franchise agreement. *Remus*, at 1241. The provision in the Wisconsin law protecting franchisees from substantial change was not meant to prevent franchisors from instituting nondiscriminatory system-wide changes without the unanimous consent of the franchisees. *Remus*, at 1241.

Other courts have similarly interpreted the Wisconsin act as allowing changes in franchise agreements based on economic necessity. *See Ziegler Co. v. Rexnord, Inc.*, 147 Wis. 2d 308, 318, 433 N.W.2d 8 (1988) ("contrary interpretation of the statute would place all risk of loss due to fundamental economic change on the grantor in perpetuity"); *Bresler's 33 Flavors Franchising Corp. v. Wokosin*, 591 F. Supp. 1533,

1538 (E.D. Wis. 1984) ("American businesses compete in a free market economy, and laws regulating trade must be interpreted in a manner consistent with free market economic principles").

Federal law also restrains a franchisor from instituting change to force a franchisee out of business. The petroleum marketing practices act (PMPA) allows a franchisor to refuse to renew a dealer for failing to agree to changes in the provisions of the franchise, provided that the changes are made in good faith and not to prevent renewal of the relationship. *See* 2 W. Garner, *Franchise and Distribution Law and Practice* § 15:10, at 21 (1990). Even with this express restraint, however, franchisors are given wide latitude to make changes in franchise agreements.

> Courts that have interpreted the good faith provision have held that there is no basis in the statute to examine the economic consequences of a proposed new franchise agreement upon the franchisee so long as the franchisor does not have a discriminatory motive and does not use the change in provisions to avoid renewal. Thus, even though new rent provisions in a franchise agreement may make a franchise unprofitable to the dealer, unprofitability is not a measure of good faith. . . .
> . . . Moreover, the fact that a franchisor presents an agreement to its franchisees on a "take it or leave it" basis does not show a lack of good faith.

(Footnote omitted.) 2 W. Garner, *Franchise and Distribution Law and Practice*, at 22 (1980).

These observations are supported by the Ninth Circuit's holding in *Svela v. Union Oil Co.*, 807 F.2d 1494 (9th Cir. 1987). When a franchisee complained that conversion of his full-service lease to a fast-service lease constituted a refusal to renew under the PMPA, the Ninth Circuit disagreed. *Svela*, at 1500. Under the PMPA, "renewal of the franchise relationship can be based on terms and conditions substantially different from those of the original franchise". *Svela*, at 1500.

Thus, even under statutory provisions protecting franchisees from changes intended to drive them out of business, courts have held that significant changes in franchise provi-

sions do not constitute termination or nonrenewal of the franchise. In addition, FIPA contains no explicit prohibition against a franchisor making substantial change without good cause and it is difficult to read the act's nonrenewal and termination provisions as providing an implied prohibition. Furthermore, as stated earlier, ARCO's minimarket leases informed franchisees that they had no right to renew and that subsequent agreements might embody substantial changes. Thus, neither FIPA nor the franchisees' original agreements expressly insulated the franchisees from new terms resulting from economic changes in the minimarket business.

Finally, we agree with ARCO that the Dawson affidavit is irrelevant to a resolution of this issue. As stated earlier, Dawson alleged that he was told before entering the original minimarket lease that ARCO would support the minimarkets and make them a national chain and would never raise royalties above 10 percent. Under the original minimarket leases, ARCO reserved the right to change the terms of the agreement upon its expiration, and FIPA does not equate such change with termination or nonrenewal by the franchisor. While FIPA is intended to protect franchisees from franchisor overreaching, we conclude that this intent does not include compensating franchisees under RCW 19.100.180-(2)(i), (j) when they continue operating as franchisees under new agreements.

We conclude that summary judgment was appropriate since, as a matter of law, ARCO did not terminate or fail to renew the franchisees' original minimarket agreements by offering them new minimarket and am/pm franchise agreements. Accordingly, we reverse the Court of Appeals and affirm the trial court's order of summary judgment in favor of ARCO.

UTTER, BRACHTENBACH, DOLLIVER, DURHAM, SMITH, GUY, and JOHNSON, JJ., concur.